IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

- - -

WILLIAM D. REYNOLDS,          :
                              :
          PLAINTIFF,          :
                              :
     VS.                      :          CASE NO. C-1-01-877
                              :
WINDELL CRAWFORD, ET AL.,     :
                              :
          DEFENDANTS.         :

- - -

Deposition of WILLIAM D. REYNOLDS, the

Plaintiff called by the Defendants under the

applicable Federal Rules of Civil Procedure, taken

before Denise L. Shoemaker, a notary public in and for

the State of Ohio, pursuant to notice and stipulations

of counsel hereinafter set forth, at the United States

District Court, Southern District Courthouse, 100 East

Fifth Avenue, Cincinnati, Ohio, commencing on Monday,

February 6, 2006, at 11:30 a.m.

- - -

DENISE SHOEMAKER
RENO & ASSOCIATES
273 LITTLE THEATRE ROAD
WAVERLY, OHIO  45690
(740) 947-9001

APPEARANCES:

      William D. Reynolds
      7013 State Route 221
      Georgetown, Ohio 45121

          Pro se.

      John E. Vincent, Esquire
      Isaac, Brant, Ledman & Teetor, LLP
      250 East Broad Street, 9th Floor
      Columbus, Ohio  43215

          On behalf of the Defendants.

              - - -

3

MONDAY MORNING SESSION,

February 6, 2006

- - -

STIPULATIONS

It is stipulated by that the deposition
of William D. Reynolds, a witness called by the
defendants under the applicable Federal Rules of Civil
Procedure, may be taken at this time in stenotypy by
the notary; that said deposition may thereafter be
transcribed by the notary out of the presence of the
witness; that proof of the official character and
qualification of the notary is waived.

- - -

4

<u>INDEX TO EXAMINATION</u>

<u>EXAMINED BY</u>                                                    <u>PAGE</u>

Mr. Vincent                                                        5

- - -

(No exhibits marked.)

1    Thereupon,

2                    WILLIAM D. REYNOLDS

3         being by me first duly sworn, as hereinafter

4    certified, deposes and says as follows:

5                    CROSS-EXAMINATION

6    By Mr. Vincent:

7              Q    Please state your name for the record.

8              A    Colonel William D. Reynolds, plaintiff.

9              Q    What's your current address?

10             A    I didn't hear you.

11             Q    What is your current address?

12             A    7013 State Route 221, Georgetown, Ohio

13    45121.

14             Q    Your social security number?

15             A    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.

16             Q    Date of birth?

17             A    12-2-37.

18             Q    You referred to yourself as Colonel

19    Reynolds.  What branch of the service were you in?

20             A    United States Marine Corps, United

21    States Air Force.

22             Q    Both of them?

23             A    Uh-huh.

24             Q    What years were you in the marine

1    corps?

2          A    1954, cross-transferred to the air

3    force in '55.

4          Q    Did you serve in Korea?

5          A    Yes.

6          Q    What year were you discharged?

7          A    '76.

8          Q    Honorably?

9          A    Absolutely.

10         Q    What was the highest rank that you

11   obtained?

12         A    Colonel.

13         Q    Full bird?

14         A    Yes.

15         Q    What did you do in the air force?

16         A    Pilot.

17         Q    Of what?

18         A    Fighter aircraft.

19         Q    What kind?

20         A    F-102's, 56's, 56-D's and L's, 56-H's.

21         Q    Anything else?

22         A    I flew a little bit for the navy,

23   A3J's, RA-5C's.

24         Q    What documentation do you get when you

1    are discharged from the military?

2            A    Please?

3            Q    Kind of documents do you get when you

4    are discharged from the military?

5            A    Well, it just depends who is doing the

6    documentation.  I have documentation that I'm still

7    seeking 50 years later, and I finally came across the

8    name of a fellow that was in Iceland, just missed him,

9    but he was my original OIC when I was an enlisted man.

10           Q    OIC, officer in charge?

11           A    Yes.

12           Q    Okay.

13           A    And he is now retired from the air

14   force.  So I can look him up, try to get all these

15   records together.

16           Q    What records do you have in your

17   possession, not today but at home or here,

18   demonstrating that you were in the military?

19           A    I have a DD214 as an enlisted man.

20           Q    What's a DD14?

21           A    DD214.

22           Q    Sorry.  What is that?

23           A    That is your release paper showing that

24   you served.  I have an honorable discharge as an

1    enlisted man, but I do not have one as an officer.

2            Q       Do you have any documentation

3    demonstrating you were an officer in the military?

4            A       That's what I'm seeking right now.

5            Q       Have you ever had your deposition taken

6    before?

7            A       Not to my knowledge.

8            Q       All right.

9            A       Not to my recollection.

10           Q       Let me go over the rules we're going to

11   follow today.  First of all, keep making all of your

12   answers verbal, yes and no.  If you say uh-huh or

13   huh-uh, I'm going to ask you what you meant because it

14   won't make it on the record.

15           A       Reasonable.

16           Q       I'm not doing it to be rude.

17                   If you need to take a break at any

18   point, you let me know and the court reporter know and

19   we'll be happy to do that.

20           A       Very good.

21           Q       Lastly, I know I'm pretty easy to tell

22   where I'm going with my questions, but try and let me

23   finish my question before you start talking.

24   Otherwise, the court reporter will be having to take

1    two of us at once and it gets confusing.

2          A    Understood.

3          Q    If you will agree to do that, I will

4    try also to not talk over you.  Okay?

5          A    Very good.

6          Q    All right.  What's your educational

7    background?

8          A    High school.

9          Q    From where?

10          A    Orville, Ohio.

11          Q    Orville?

12          A    Yes.

13          Q    Is that O-r-r-v-i-l-l-e?

14          A    Correct.

15          Q    Where is that?

16          A    Wooster, Canton, that general area.

17    You've heard of Smucker's apple butter, surely.

18          Q    What year -- you graduated?

19          A    Yes.

20          Q    What year did you graduate?

21          A    I left school and went in the marine

22    corps in '54.  I didn't get my diploma until '55.

23          Q    What were you, 17 then when you left?

24          A    Sixteen.

1   Q Did you actually get a diploma or a

2 G.E.D.?

3   A Diploma.

4   Q Have you had any other formal

5 education?

6   A I have all my electronics courses from

7 the air force.

8   Q Where did you go to ground school?

9   A Ground school was Lowry Air Force Base,

10 Denver, Colorado.

11   Q You said you enlisted in the marine

12 corps originally.

13   A Right.

14   Q How did you get transferred over to the

15 air force?

16   A Just cross-transferred.

17   Q What does that mean?

18   A Means you can leave one branch and move

19 directly to the other branch.

20   Q Is that something because of the war

21 that they offered?

22   A I don't think you can do that anymore.

23 That's 50-some years ago.

24   Q What made you want to go in the

1  military?

2      A    Well, I had two brothers in the

3  military during Korea.  Being the youngest, I was the

4  only kid in my school that owned his own car at 16

5  years old.  Therefore, I had insurance and things that

6  had to be taken care of.  I was too young to get a

7  job, although I worked in a dry good store and worked

8  on a carpenter gang that was always under the table to

9  be able to buy that vehicle.  But anyway, that's why I

10  went in the marine corps.  My other brother was in the

11  marine corps, and it just seemed like the proper thing

12  to do being young and dumb.

13      Q    Well, you stuck with it though through

14  1976, so it couldn't have been all bad; right?

15      A    Well, it wasn't all bad.  It's when the

16  shooting was going on is when it was bad.

17      Q    Did you actually fly in combat?

18      A    Yes, Vietnam.

19      Q    What was your -- what company,

20  division, or group were you with?

21      A    The 6 Fighter Inceptor Squadron.

22      Q    Do you have any commendations, medals?

23      A    I have, but I can't prove them.

24      Q    Why not?

12

1      A      Because everything was burned up in a

2  fire at my father's home.

3      Q      What do you recall about commendations,

4  medals?

5      A      I definitely have two Purple Hearts.

6      Q      For what injuries.

7      A      Wounds.

8      Q      What wounds?

9      A      Wounds around my legs in Korea.

10     Q      What happened in those?  Just so I can

11 get some more information.

12     A      I was shot.  Vietnam I was shot in the

13 right leg.

14     Q      Do you have a Purple Heart for Vietnam?

15     A      Yes, uh-huh.

16     Q      So you had two in Korea.

17     A      No, one in Korea and one in Vietnam.

18 The Distinguished Flying Cross, Combat Infantry Badge.

19 I got a Bronze Star with a B class for valor.

20 Distinguished Service Cross, I forgot about that, the

21 highest one.

22     Q      What did you get that for?

23     A      Saved a bunch of fellows' lives in

24 Vietnam that got pinned down by Charlie from the 102nd

13

1    Airborne.

2         Q    You don't have any documentation or any

3    of the medals or any ribbons?

4         A    Everything was burned up.

5         Q    What year was the fire?

6         A    '77.  I think it was '77.

7         Q    What was the address of the house that

8    burned?

9         A    Oh, Lord.

10        Q    What town is it?

11        A    Gallipolis, Ohio.

12        Q    Do you recall what road it was on?

13        A    RD 1.

14        Q    R as in Robert, D as in David 1?

15        A    Right.  Gosh, I can't think of the name

16   of that road it's been so long now.  Perhaps it will

17   come to me.  I can't remember.

18        Q    All right.

19        A    You got to remember, now, I've had

20   three strokes and a heart attack.  These things are

21   difficult to remember.

22        Q    You said it was your father's house

23   though?

24        A    Yes.

14

1    Q    What was your father's name?

2    A    Edward N. Reynolds.

3    Q    N as in?

4    A    Newton.

5    Q    Couldn't think of anything to go with

6    that.  I didn't want to say Nancy because I was not

7    trying to insult your dad.  I couldn't think of

8    anything.  All right.  That was your father.

9         Are you married?

10   A    Yes.

11   Q    What's your wife's name?

12   A    Phyllis J.

13   Q    Reynolds?

14   A    Yes.

15   Q    How long have you and Mrs. Reynolds

16   been married?

17   A    It will be 38 years in May.

18   Q    Do you have any children?

19   A    I have from a previous marriage.

20   Q    What was your previous wife's name?

21   A    Jackie, Jacqueline.

22   Q    Reynolds as well?

23   A    Yes.

24   Q    Were you divorced from Jackie?

1          A      She divorced me.

2          Q      What county were you divorced in?

3          A      Oh, my.  Isn't that awful.  We were in

4    Wayne County and it was below Holmes County.  I can't

5    even remember the name of it, for heaven's sake.  I'm

6    sorry, I don't remember.  I can't remember.

7          Q      You think you lived in Wayne County at

8    the time?

9          A      At the time we were married, yes.  But

10   I can't think of the county where we were divorced.

11   That was your question.

12         Q      You and Jackie had some children?

13         A      Yes, two.

14         Q      What are their names and ages?

15         A      Diane Kay and Beth Ann.

16         Q      What is Diane's last name now?

17         A      I have no idea.  I have no idea.

18         Q      Don't keep in touch with her?

19         A      No.

20         Q      How about Beth Ann?

21         A      None.  I have no idea.  I do know she

22   lives in Orville, Ohio.  That's all I can tell you

23   because my brother still lives there.

24         Q      What was the reason for your divorce

1    from Jackie, or what was the reason given for her

2    divorcing you?

3        A    She had more ideas about what should be

4    done than what I did.

5        Q    Okay.  Just didn't get along?

6        A    She was a cheap whore, that's a quote

7    from her sister.

8        Q    Jackie and you -- I'm sorry, let me

9    start over.  Diane and Beth were both children of

10   Jackie and you; correct?

11       A    Yes, that's correct.

12       Q    They are your biological children?

13       A    That's correct.

14       Q    When is the last time you saw either

15   one of them or had contact with them?

16       A    About 35 years.  I'm sorry, I did

17   mail -- I did, through my brother, I mailed their

18   birth certificates, both of their birth certificates

19   to them with a bunch of pictures and stuff that didn't

20   mean anything to me anymore and fired those up to

21   Orville, and that's the last of heard of it.

22       Q    How old were those girls when you last

23   saw them or had any contact with them?

24       A    Beth Ann will be 47 February the 9th,

1    and Diane will be 45 in, I think it was March.

2         Q     Have you had any other marriages

3    besides Phyllis and Jackie?

4         A     No.

5         Q     And you have no other children?

6         A     No.

7         Q     Was Phyllis previously married?

8         A     Yes.

9         Q     Did she have any children from that

10   marriage?

11        A     No.

12        Q     I think you might be jumping in a

13   little early on my questions for the court reporter.

14        A     I'm sorry.

15        Q     That's okay.  I'm not trying to be

16   rude.  I want you to make it easier on her.

17              You said that you had electronic

18   courses for the military?

19        A     Yes.

20        Q     Where did you go to boot camp?

21        A     Sampson Air Force Base, Geneva, New

22   York.

23        Q     And what further schooling or training

24   did you have in either the marines or air force?

18

1          A     In the marine corps I was a rifleman.

2    Air force I was at Lowry Air Force Base in Denver,

3    Colorado, airborne, radar, electronics.

4          Q     I think for health care you told me

5    before you go to the VA hospital?

6          A     Uh-huh.

7          Q     Which VA hospital do you go to?

8          A     I use both.  I use Clermont County and

9    the VA here in Cincinnati.

10         Q     Do you have kind of a primary care

11   physician?

12         A     Yeah, I do, Dr. Terri Lynn Brody,

13   B-r-o-d-y.

14         Q     Is that a male or female?

15         A     Female.  Super nice lady.

16         Q     Where is Dr. Brody's office?

17         A     4343, I think it is, Ferguson Drive,

18   Cincinnati, Ohio, but I can't remember the zip code,

19   which is in Clermont County.

20         Q     You said you go to the VA in both

21   Clermont County and Cincinnati?

22         A     Right.  If I have to have special tests

23   done, then I have to have it done down here in

24   Cincinnati.

19

1        Q      Now, doesn't the VA have some of your

2   information for your military?

3        A      The VA is the last one to ask for

4   information.  They're the last ones to ask for

5   information.

6        Q      Okay.  What did you do after 1976,

7   after you were honorably discharged?

8        A      I went to work at AVCO Corporation,

9   Cincinnati, Ohio.

10       Q      What's the name of it, AVCO?

11       A      AVCO, A-V-C-O, Aviation Corporation.

12   Military supplier of electronic units, systems.

13       Q      How long were you employed there?

14       A      About four years.

15       Q      What was your position?

16       A      I was in the OSI at that time.

17       Q      What's that stand for?

18       A      Office of Service Investigation.  There

19   I just worked on the floor, white collar, for various

20   radar systems, jammer systems, radio systems.

21       Q      You had no engineering degree; correct?

22       A      I do not have an engineering degree.

23       Q      What were you -- what were your duties

24   then?  I know you said you were white collar working

1    on the floor.  What does that mean?

2            A     Quality control.

3            Q     Where did you go after that?

4            A     Let's see, through AVCO Corporation I

5    went to Iceland, super hush-hush project.

6            Q     What year was that?

7            A     That would have been 1972 before I got

8    out of the air force.

9            Q     From 1976 to about 1980 you were with

10   AVCO Corporation?

11           A     Yes.

12           Q     What did you do in 1980?

13           A     I went to Standex International.

14           Q     S-t-a-n-d-e-x?

15           A     Yes, uh-huh.

16           Q     What were your job duties there?

17           A     Let's see, I went in as a quality

18   control engineer.  Then I was promoted to

19   superintendent of production, and then promoted to

20   vice president of engineering.  On 12-7-78 I was

21   rear-ended while I was sitting at a traffic light on

22   my first day going to work as a vice president.  I

23   didn't even get to sit in my chair.

24           Q     One second, December 7th of what year?

1      A      1978.

2          Q      That's two years before you started at

3   Standex International.

4          A      Please?

5          Q      That's two years before you told us you

6   started at Standex International.

7          A      Wait a minute.  I went to Standex --

8          Q      I think you said 1980; right?

9          A      Right.  Right around 1980.  Right in

10  that area.

11         Q      All right.

12         A      So I was only with them until 1978 when

13  I was rear-ended.

14         Q      One second here.  I think you are

15  giving the wrong decade.  Do you mean 1988?

16         A      No, '78.

17         Q      But you didn't get there until 19 --

18         A      I've got something twisted there.

19         Q      Let's start over.  Let's make it

20  simple.  I think you told me in 1976 you started with

21  AVCO.

22         A      Yes, that's when I got out of the air

23  force and went with AVCO in '76.

24         Q      For four years?

22

1          A       Approximately four years.

2          Q       In approximately 1980 you began working

3     for Standex; is that right?

4          A       That's about right.

5          Q       Then after that you had an accident

6     that you are going to tell us about.

7          A       Right, I was rear-ended.

8          Q       But it's after 1980?

9          A       No.  I've got the dates screwed up

10    there.  I got the dates wrong.

11         Q       Help me with it.

12         A       It's just difficult to remember.

13    That's been 27 years ago.  But the date definitely was

14    Pearl Harbor Day 1978 because my dad passed away March

15    14th of 1978.  Those are firm dates there.

16         Q       Do you have your discharge from the air

17    force date wrong?

18         A       I got it all balled up.  I was

19    discharged in 1976.

20         Q       Okay.

21         A       September the 1st, 1976 I was

22    discharged from the air force.  I went to work at AVCO

23    that year.  Yeah, in '78 -- gosh, I can't remember.

24         Q       Were you a vice president with AVCO?

1          A     Yes, I had been promoted to a vice

2     president of AVCO.

3          Q     Maybe that's the problem.  You told us

4     you were promoted to vice president with Standex.

5          A     Not AVCO.  Strike that.

6          Q     All right.

7          A     Standex I was promoted to vice

8     president.

9          Q     I'm trying to get your years here

10    straight.  I understand you're having some issues with

11    remembering this, but let's try and get it straight.

12    1976 you started with AVCO?

13         A     Yes.

14         Q     Approximately four years you worked

15    there?

16         A     It may not have been four years.  I

17    just simply cannot remember.

18         Q     But you think at some point you went

19    with Standex International?

20         A     I definitely was with Standex

21    International because I went in there as a quality

22    control engineer.

23         Q     How long were you a quality control

24    engineer with Standex?

24

1          A      About a year.

2          Q      How long were you a superintendent of

3     production with Standex?

4          A      About another year.   Then I was

5     promoted to vice president of the Paul Smith Division.

6          Q      And you believe on December 7, '78 you

7     were hit from behind?

8          A      That's when I was rear-ended, that is

9     correct.

10         Q      You're sure that's the date.   Okay.

11    We've got some other dates screwed up.   We'll figure

12    those out later because I don't think you can recall

13    them right now.   Is that fair?

14         A      Fair enough.

15         Q      So you were in an accident on December

16    7, 1978.   Why don't you tell us about that.

17         A      I was sitting at a traffic light and

18    this fellow, he was going about 35 miles an hour and

19    he rear-ended me while I was sitting at the traffic

20    light with my brake on.   And, of course, that

21    destroyed my back.

22         Q      What happened, did you break any bones?

23         A      No.   L4, 5, and 6 really, really

24    screwed up.

1        Q      Do you know what it did?

2        A      Huh?

3        Q      Do you know what the injury was at L4,

4   5, and 6?

5        A      Well, first of all, I had been ejected

6   out of my aircraft in Vietnam, that would have been

7   '63, I guess it was, and that made me about an inch

8   and a half shorter just from the compression.  So when

9   he rear-ended me, that really upset the apple cart and

10  I haven't worked since.  That's been 27 years.

11       Q      How did you make a living?

12       A      I was on Medicare.

13       Q      From 1978?

14       A      Yes.  Wait a minute.  They made it

15  effective in 1981, but then they made it retroactive

16  back to '78, but my card shows 1981.

17       Q      What stopped you from being able to

18  work?

19       A      Because all my work was sitting and I

20  simply cannot sit like that.

21       Q      Does that mean you are able to work --

22  as long as you're not sitting are you able to work?

23       A      I can do some things.  I can run my

24  weed eater as an example, the lawn mower, garden

1    tiller.

2            Q      Is it a riding mower?

3            A      Uh-huh.

4            Q      But you are able to ride on it okay?

5            A      Well, it takes me about four hours to

6    do just a few minutes work, but that's the way it is.

7            Q      Who treated you for those injuries?

8            A      Oh, my God.  There is a list that I

9    won't even attempt to give you.

10           Q      Do you have any records which would

11   tell us who those physicians were?

12           A      The day that I was hit, I don't even

13   remember what hospital they took me to.  I just simply

14   don't remember.  But I was -- I'm going to say 20

15   different doctors, including Mayo Clinic.  Mayo Clinic

16   couldn't even help me.

17           Q      What was wrong with you that they

18   couldn't help you?

19           A      You'll have to ask the boys up there

20   about that because I don't know.

21           Q      Have you ever had any surgery to your

22   back?

23           A      No.

24           Q      Has the VA treated you for any of your

1    back problems?

2           A     They have done a CAT scan on my back.

3    They said you're really screwed up.

4           Q     Has Dr. Brody treated you for any of

5    those problems?

6           A     It was through Dr. Brody that I had the

7    CAT scan.

8           Q     When was that?

9           A     About two years ago.

10          Q     Let's talk about what medications

11   you're on today as we sit here today.

12          A     I never dreamed you would ask that

13   question.

14          Q     It's important because we would like to

15   know, obviously -- let me ask you a question first.

16   Are you on any medications today that cause problems

17   with your memory?

18          A     Not to my knowledge.

19          Q     Let's go ahead and see what medications

20   you are on.  Are these medications similar to the

21   medications you would have been taking on October 10th

22   and 11th of 2000?

23          A     Yes.

24          Q     You're not on more medications now?

28

1    A    I'm on different types medications.

2    Q    For the same problems?

3    A    Yes.

4    Q    Do you have them with you?

5    A    No, I don't have them with me.  I can

6  see if I can make a list.

7    Q    We'll go off the record while you try

8  to make a list.  Okay?

9              - - -

10        Discussion held off the record.

11              - - -

12    A    You must understand the medications

13  that I'm going to try to list for you now are not the

14  medications that I was on back when I was arrested by

15  the two deputy sheriffs.

16    Q    Why are they different?

17    A    Because the doctor changed them.

18    Q    But they're for the same conditions;

19  correct?

20    A    Basically, yes.

21    Q    Do we need to go off the record?

22    A    You may step off.

23              - - -

24        Discussion held off the record.

- - -

A       The first one is hydrochlorothiazide, calcium chloride, Coumadin.   There's four more, but I cannot tell you what they are.

By Mr. Vincent:

Q       What are they for?  What are your medications for?  Let's talk about the first one.  You said hydro something?

A       That's a diuretic.

Q       What's that for?

A       So you don't accumulate water in your system.

Q       Okay.  That's for people who have congestive heart failure; is that right?

A       Please?

Q       Is that for people who have congestive heart failure?

A       I had a heart attack, okay.

Q       Is that your understanding of what that medication is for?

A       That's correct.

Q       How about the calcium chloride, what's that for?

A       Cholesterol.

1    Q    Do you have high cholesterol?

2    A    Yes.

3    Q    What is Coumadin for?

4    A    Coumadin is --

5    Q    A blood thinner; right?

6    A    No, it's not a blood thinner.  Get that

7    out of your head now.  It's an anticoagulant.  Now, it

8    cannot be a blood thinner or you would have too much

9    blood in your system and it's got to overrun

10   somewhere.  So it can't be a blood thinner.  It's an

11   anti-coagulant to prevent stroke and/or heart attack.

12   Q    What are your other medications you

13   can't currently recall, what are those for?

14   A    They're still in the same vein of

15   cholesterol and, I'm sorry, I can't tell you.  I gave

16   you a list of those.  Surely you got that.

17   Q    Who is the doctor who has prescribed

18   most of these medications for you?

19   A    Dr. Brody.

20   Q    So that doctor is probably the best one

21   for us to ask those questions of; is that fair?

22   A    Sure.

23   Q    If I give you an authorization that

24   allows us to see Dr. Brody's records so we can just

1   get all the medications from there and the information

2   from her records --

3         A     You may speak to her, but I'm not going

4   to allow you to have any of the records.

5         Q     Okay.  Sir, I believe you've alleged in

6   this case that you suffered some medical problems as a

7   result of the incident of October 11, 2000.

8         A     That's correct.

9         Q     As a result of that we are going to

10  request that medical records on your conditions, on

11  your various conditions that you have be released so

12  if necessary we can have an independent physician take

13  a look at those records as well as you in determining

14  whether or not he believes you suffered any medical

15  problems as a result of any of the allegations in this

16  complaint.  Will you agree to sign an authorization

17  allowing for such a use?

18        A     Not for Dr. Brody, absolutely not,

19  because these medications were changed by her.  We

20  must go back to Dr. McHenry who was my physician when

21  I was arrested.

22        Q     Okay.

23        A     Now, I have already made contact with

24  him with an affidavit for him to sign, which he was

1    readily acceptable, he said this was fine.  He didn't

2    have any problem with it.  He said, I've got to take

3    it to our counsel, which was very reasonable.

4                    Well, counsel has drug their feet on

5    it.  I went with him -- to him on the 25th of this

6    month -- beg your pardon, the 25th of January and

7    presented him with that affidavit that would tell

8    about all the medications and would tell -- just tell

9    the whole story.

10           Q      The fact is I don't really have any use

11   for an affidavit.  What I would like to get is Dr.

12   McHenry's records so I can have an independent

13   physician view those.  Would you agree to execute an

14   authorization to Dr. McHenry for that use?

15           A      Only with Dr. McHenry's permission will

16   I think about it.

17           Q      He doesn't have to give you permission.

18   You're the patient.  I will go ahead and present that

19   to you and we'll approach the court if you are not

20   willing to sign it.

21                   What other physicians were you treating

22   with at the time of October 11, 2000?

23           A      That was the only one.

24           Q      Just Dr. McHenry?

33

1    A    Dr. Michael McHenry.

2    Q    Where is his office?

3    A    421 Home Street.

4    Q    Home, H-o-m-e?

5    A    Yes.  Georgetown, Ohio 45121.

6    Q    Were you treating at either of the VA

7    hospitals during that time frame?

8    A    Not at that time, no.

9    Q    You've mentioned several times you had

10   a couple strokes and a heart attack.  Why don't you

11   tell me some of the medical problems you have had

12   since 1978 and the approximate years you've had them.

13   A    Let's see, I had the first stroke in

14   '94, I think two in '95, and somewhere in that period

15   I had a heart attack, although I didn't even know it.

16   It showed up on a strip chart.

17   Q    Any other chronic conditions you've

18   been diagnosed with?

19   A    No.

20   Q    Any other diseases?

21   A    No.

22   Q    When is the last time you were

23   hospitalized?

24   A    It was each of those three strokes was

1    the last time I was actually hospitalized.

2         Q    Since 1978 have you been employed

3    anywhere?

4         A    No.

5         Q    Let's talk about the times you've been

6    arrested, not just in Brown County.  Why don't you

7    give me some of your history with being arrested by

8    officers.

9         A    Brown County, Ohio.

10        Q    Are you telling me you weren't arrested

11   at all while you were in the military?

12        A    Never.  As a matter of fact, my record

13   will show I haven't even had a parking ticket for a

14   moving violation in a vehicle in more than 60 years.

15        Q    What will show that?

16        A    The record will show, NCIC will show

17   it, there's nothing there.

18        Q    What's NCIC?

19        A    That's the -- when you call up London,

20   Ohio, that's the national -- what was that?  NCIC.

21   That's where the police can check your record to see

22   if you have any charges against you.

23        Q    Do you have a copy of that?

24        A    I have one, I have a copy for 3-12 1998

35

1    that shows there were none.  I was arrested.  That's

2    the other case you have in your hand.

3          Q    No, this is not a different case.  This

4    is this case.

5               When did you move to -- when did you

6    move to Brown County?

7          A    Just a little over 20 years ago.

8          Q    Where did you move from?

9          A    Sharonville, Ohio.

10         Q    What county is that, do you know?

11         A    Please?

12         Q    What county is that?

13         A    Hamilton.

14         Q    How long did you live in Sharonville?

15         A    It was 17 years.

16         Q    I presume yourself and Phyllis lived

17    there, you were married at that point?

18         A    Yes, sure.

19         Q    So if I check Hamilton County, you are

20    telling me they would have no record of any arrests of

21    you in Hamilton County?

22         A    That's correct.

23         Q    Why did you move to Brown County?

24         A    I couldn't work anymore, so let's go to

1    the country.

2         Q    All right.  Did you own a home in

3    Sharonville?

4         A    Yes.

5         Q    You sold that?

6         A    Yes.

7         Q    And you bought the place you are now?

8         A    That's correct.

9         Q    Who did you buy it from?

10        A    What do you mean?

11        Q    Do you know the person you bought it

12   from?

13        A    The name of the people we bought the

14   property from, yes, Denver and Glenda Ruggles,

15   R-u-g-g-l-e-s.

16        Q    Did you know them before you bought the

17   land?

18        A    Just casual acquaintances.

19        Q    How did you find out they had land for

20   sale?

21        A    Because we fished right on the creek

22   where he actually owned the property.

23        Q    How many acres did you buy?

24        A    Almost 15 acres.

1   Q  Do you still own all 15 acres?

2   A  That's correct.

3   Q  Did you build your own home on the

4 land?

5   A  No, it's a double-wide mobile.

6   Q  When was that moved to the land?

7   A  November the 5th, 1985 we turned the

8 key and moved in.

9   Q  Besides your wife, does anyone else

10 live there with you?

11   A  No.

12   Q  Has anyone else lived there with you

13 since 1985?

14   A  No.

15   Q  When did you first start having trouble

16 with neighbors on that property?

17   A  Which neighbor?

18   Q  Any neighbor.  How long after November

19 5th of 1985 did you start having problems?

20   A  Started having problems with the little

21 children insisted on running through our yard with

22 their bicycles and, of course, the sheriff's

23 department wouldn't do anything about it.

24   Q  How long after you moved in did you

1    start having trouble with the little children riding

2    bikes?

3         A      Four months, five months.  In the

4    spring, in the spring of '85.

5         Q      Were they damaging your yard when they

6    rode through it?

7         A      Of course they did.

8         Q      In what way?

9         A      Cutting ruts in the grass.

10        Q      Did you call the police?

11        A      Called the sheriff's department.

12        Q      What did you want them to do?

13        A      Go down and tell the children to stay

14   the hell away from us.

15        Q      How come?

16        A      They were nothing but a bunch of

17   welfare bums and had I known that, I would have never

18   bought that property.

19        Q      Denver didn't tell you that?

20        A      That's right, he didn't tell me.

21        Q      Are you and Denver still friends?

22        A      Absolutely not.

23        Q      Is it because of this land?

24        A      If you would take a look at some of my

1    photographs of what Denver and Glenda have done the

2    whole length of State Route 221 that they have any

3    association and/or own property on is a great big

4    junkyard.   State Route 221 is only eight miles long

5    and they still have a lot of property on State Route

6    221.   It's all a junkyard.

7         Q    When is the last time you talked to

8    Denver Ruggles?

9         A    Oh, gosh, it's been years ago.

10        Q    Is he still living?

11        A    Oh, yes, Denver is up in age.  Let's

12   see, Denver would be 76, 77 now.

13        Q    So four months after you moved there

14   you started having trouble with children?

15        A    That's right.

16        Q    That was around 1985?

17        A    That was the winter, we moved there the

18   winter of '85.  So it was the spring of '86.

19        Q    Okay.  What other kind of problems --

20   take me through the next ten years of your life on

21   this property.

22        A    Well --

23        Q    And the problems you had with

24   neighbors.

1         A       The neighbor above us, that would be

2    Flora Prather, Flora and Bill Prather, we were very

3    good friends, very close and tight, visited often,

4    they were tobacco people.

5         Q       What does that mean?

6         A       Raised tobacco.  And everything was

7    fine.  Well, her brother Richard Wainscott, his

8    mother-in-law got ill and he bought a 12 by 50 trailer

9    and put her in that so they would be right handy to

10   the house.

11            Then these people decided, gee, we can

12   make a lot of money doing this.  So they have put up,

13   I think it's nine trailers, and all of the people are

14   welfare bums and, of course, they got their

15   motorcycles and their hot rods, their go-carts and, of

16   course, their lawn mowers that they use for

17   transportation to go to Higginsport, which is three

18   miles away, to drink their beer, buy their groceries

19   and so forth.  The highway patrol won't do anything

20   about it.

21        Q       Have you called the highway patrol?

22        A       Yes, definitely.

23        Q       Are we still within that first ten-year

24   period?

1          A      It's continuing today for heaven's

2     sake.

3          Q      Sure.   And we'll talk about that.   What

4     other problems?

5          A      Then Flora and Bill decided they were

6     going to put trailers in too.

7          Q      Who did?

8          A      Flora and Bill.

9          Q      You've mentioned Flora and Bill Prather

10    numerous times.   Who are they?

11         A      They're neighbors.

12         Q      How long --

13         A      Meaning they own the property above us.

14    They're not neighbors.   Bill is dead and gone now, but

15    Flora is not a neighbor.   She is a woman that has the

16    property above us.   But they decided they were going

17    to put in trailers.   And as I speak, there's nine

18    trailers they put on their property and brought all

19    these welfare bums in that we have to put up with all

20    the noise, racket, and so forth that I have just

21    described before.

22         Q      Okay.   How many times in the first ten

23    years you lived there did you call the police for

24    complaints about problems with your neighbors?

42

1       A       Twenty-five, maybe more.

2       Q       I was going to say 25 per year or 25

3   total?

4       A       I'm going to say 25 total.

5       Q       That the first ten years?

6       A       Yeah, that's reasonable.

7       Q       Let's talk about 1992.  Do you recall

8   being arrested for assault?

9       A       1992.  Assault upon whom?

10      Q       Do you recall being arrested for an

11  assault?

12      A       No.

13      Q       Are you telling me it didn't happen?

14      A       I'm going to tell you that on 3-12

15  1998 --

16      Q       No, 1982.  Let's stick there.

17      A       1982?

18      Q       Yes.

19      A       No.  Do you have something that I don't

20  know?

21      Q       I'm just asking you if you were

22  arrested on October 10th of 1992 for assault?

23      A       No.

24      Q       Were you arrested on June 3rd of 1994

43

1    for criminal trespass?

2           A     For what?

3           Q     Criminal trespass.

4           A     No.  What was that date again?

5           Q     June 3, 1994.

6           A     No.

7           Q     You don't recall that?

8           A     No.

9           Q     Are you telling me it didn't happen or

10   you don't know?

11          A     I don't remember that happening

12   definitely.  Therefore, I need to ask a question, who

13   is the person who said that?

14          Q     Fortunately I'm doing a deposition.

15   You don't get to ask me questions today.

16          A     Very good.

17          Q     March 11th of 1998 do you recall being

18   arrested for disorderly conduct, menacing, and assault

19   on a police officer?

20          A     3-11.  Yes, I do.  That case is in this

21   court right now where I have sued them for that.

22          Q     Sure, a civil case.  You were convicted

23   criminally though?

24          A     That's correct.

44

```
1       Q      By a jury?

2       A      That's correct.

3       Q      You were found guilty?

4       A      That's correct.

5       Q      How long did you spend in jail?

6       A      Thirty days.

7       Q      How long were you on probation?

8       A      None.  See, the thing is they didn't

9   file a jurat.

10      Q      That's fine.  Was that conviction ever

11  overturned?

12      A      No.  It's going to be overturned when I

13  finish up in this federal court.

14      Q      Can't be.  There was never an appeal of

15  that conviction filed; correct?

16      A      Did not appeal it.  Wait a minute.

17  Wait a minute.  I think John Hapner appealed it.

18      Q      That appeal was unsuccessful?

19      A      Unsuccessful.  In 20 years I've only

20  seen one be successful out of the 12th District.

21      Q      Sounds like they have good judges.

22             July 2, 1998 do you recall being

23  arrested for menacing and resisting arrest?

24      A      When?
```

1        Q        July 2, 1998.

2        A        For assault?

3        Q        For assault -- I'm sorry, resisting

4    arrest and menacing.  You don't recall that?

5        A        No, I do not.

6        Q        How many times have you been arrested

7    in your life, Mr. Reynolds, that you recall?

8        A        Two.

9        Q        What were those dates?

10       A        3-12 -- 3-11 1998 and 10-11 2000.

11       Q        You're not telling me -- now, I listed

12   you several dates, and I think what you told me is you

13   are not denying that you were arrested for these

14   things I read to you.  You just don't recall?

15       A        I don't recall them.

16       Q        You are not denying that they occurred;

17   correct?

18       A        I can't deny that they didn't occur but

19   I don't remember.  What I need to know is what was the

20   end result of these.

21       Q        When was the last time you were

22   arrested?  Is it October 11, 2000?

23       A        That's correct.

24       Q        Between 1995 and 2000, what problems

1  were you having with your neighbors?  We already

2  talked about the first ten years you were there.

3       A    Well, Flora Prather moved her daughter,

4  her welfare bum son, all of her welfare bum sons and

5  daughters down there, so the same aggravation is going

6  on as we speak.

7       Q    What is that?

8       A    Let's see.  Wait a minute.  Let me back

9  off of that a little bit.  The address is 7043 State

10  Route 221 is where the last problem that I am aware of

11  has happened where this Dawayne Daughterty took a gun

12  to his brother, pointed it right at him and went bang.

13       Q    Were you there?

14       A    No, I wasn't there.  It's all in the

15  record.

16       Q    Wait a minute.  What record?

17       A    In the Brown County court system.  I

18  don't remember the name, but the mother has filed

19  criminal charges against her son.  There gives you a

20  better idea of what mom and I have been putting up

21  with.

22       Q    Who's mom?

23       A    My wife.  I call her mom.  I'm sorry.

24       Q    I thought your mother may know.

1          A       No.   She would be just a little bit

2    old, don't you think?

3          Q       Maybe, but I thought maybe good health.

4                  Okay.   How many times between 1995 and

5    2000 did you probably call the sheriff's department or

6    highway patrol to report different complaints you

7    have?

8          A       Oh, 10, 15, anyway, at least.

9          Q       Why don't you have give me an idea.

10   Were some of those for littering?

11         A       Yes.

12         Q       Describe for me what your complaints

13   about littering were.

14         A       You see, the welfare bums that lived in

15   that old house down there below us, after we got rid

16   of those boys -- the boys wound up in prison, by the

17   way.   After we got rid of those boys, other welfare

18   bums moved in there and, of course, they would break

19   their damn beer bottles in my yard.   We then had a

20   blacktop driveway.   They could break bottles nicely

21   and then they'd scatter their pizza cartons and so

22   forth all over the yard so I'd have to pick it up.

23         Q       How do you know who was doing that?

24         A       It was very simple, because the damn

48

1    bottles, that's the only person that drank that kind

2    of beer.

3            Q    You live on a state route; correct?

4            A    Right.

5            Q    Hundreds of different people drive down

6    that road a day probably; is that fair?

7            A    No.

8            Q    How many people?

9            A    When we first moved there, we would

10   turn around and wave to the people, so there was an

11   occasional person.  Today it's pretty heavy traffic as

12   we speak.

13           Q    Okay.

14           A    Back then in 1995 there weren't many,

15   there weren't that many.

16           Q    Did you ever catch someone littering in

17   your yard?

18           A    I didn't actually get to catch them,

19   no.

20           Q    Did you ever physically see someone

21   littering in your yard?

22           A    I saw them throw it, but I don't know

23   who, which one it was.  I don't know which one it was.

24           Q    So although you had numerous complaints

1     about littering, you weren't sure who did it, fair to

2     say?

3          A     I was sure who did it.  The fact is

4     they wouldn't even go down and pursue it.

5          Q     Wait a minute.  You didn't see who did

6     it.  You told me you didn't see --

7          A     I said on occasion I did see it happen

8     personally.

9          Q     Once?

10         A     Once.

11         Q     One time.

12         A     They wouldn't go down and do anything

13    about it.

14         Q     But you don't know who did it.  You

15    just saw that someone did it?

16         A     Yeah.  Then they pulled in that

17    driveway.

18         Q     But you're not sure if it was someone

19    visiting or someone who lived there?

20         A     Correct.

21         Q     So the other at least 10 or 15 times

22    you've called about littering, you didn't see the

23    person who did it and you don't really know for a fact

24    who did it; is that fair?

50

1        A     That's fair.

2        Q     Let's talk about barking dogs.  You

3   seem to get very frustrated with barking dogs.

4        A     Who wouldn't.

5        Q     How many times have you called, prior

6   to 2000, prior to October 11, 2000, how many times

7   have you called miscellaneous police departments, dog

8   wardens, highway patrol --

9        A     Dozens.

10        Q     -- talking about barking dogs?

11        A     Dozens of times.  And nobody knows what

12   the law is so they don't do anything.

13        Q     Nobody but you?

14        A     Seems that way.  The dog warden doesn't

15   know what the law is.

16        Q     Wait, wait, wait.  Do you accept the

17   possibility that maybe you don't know what the law is?

18        A     No, no.  I have the law.

19        Q     Okay.  Is it -- are you talking about

20   criminal statutes?

21        A     I'm talking about Chapter 3767 of the

22   revised code.

23        Q     Which you believe says what?

24        A     I believe says there's prohibition

51

1    against noisome animals.

2         Q    When you moved to the country, are

3    there any farms around you?

4         A    Not farms per se.  Like the people next

5    door have 36 acres and the people above them have

6    80-some acres.  But this is big hillside country;

7    therefore, there's no farms per se, yes.

8         Q    When did you have a dog?  I know you

9    had one --

10        A    I had a basset hound who we had to have

11   put to sleep because he had broken down, and I had a

12   beagle dog that somebody dropped and mom nursed him

13   back to health.

14        Q    What years did you have those dogs?

15        A    Oh, Lord.  We had to have that beagle

16   dog euthanized because the dog warden and

17   commissioners wouldn't enforce the law.

18        Q    What do you mean by that?

19        A    They wouldn't enforce the law for me.

20        Q    What do you mean by that?

21        A    They wouldn't take it to the sheriff's

22   department and enforce the law.  I'm talking about

23   3767.13.

24        Q    Once second here.  This is a

52

1    deposition.  It's my chance to learn what you believe

2    and what you think.  What do you mean by the dog

3    warden and sheriff's department wouldn't enforce the

4    law, what law?

5         A    The law is that dogs had to be

6    licensed.  That's a law.

7         Q    All right.  Where is that law?

8         A    955. 01 through 955.99.

9         Q    Of what?

10        A    Ohio Revised Code.

11        Q    How about the county of Brown County?

12        A    The what?

13        Q    Brown County.

14        A    That's Brown County, yes.

15        Q    Do they require dogs be licensed in

16   Brown County?

17        A    Absolutely.  It's a state law.

18        Q    No, it's not, but that's fine.  Do you

19   believe it is?

20        A    I do believe it is.

21        Q    All right.  Let's talk about what other

22   laws you believe were not enforced.

23        A    We are talking about Ohio Revised Code

24   955.01 through .99.

53

1   Q  Okay.

2   A  Vicious dogs had to be in cages,

3 dangerous dogs had to be in cages, had to all be

4 licensed, they had to have $50,000 liability insurance

5 and so forth.

6   Q  What vicious and dangerous dogs do you

7 believe that applies to?

8   A  Chows, pit bulls.  Any mix of those.

9   Q  Says who?  Who says that, that those

10 are the breeds that --

11   A  Ohio Revised Code.

12   Q  All right.  What chows and pit bulls

13 live by you?

14   A  Oh, absolutely there were.

15   Q  What ones?

16   A  They were located at 7101 State Route

17 221, 7098 State Route 221, 7061, 7043 and 7021, all

18 State Route 221.  Then the bum below us.

19   Q  Who is that?

20   A  That would have been Mike Flocker had

21 all kinds of pit bulls, chows, mixes thereof.  None of

22 them were confined properly, no liability insurance,

23 et cetera, et cetera.

24   Q  How do you know that?

54

1          A      He was a welfare bum.

2          Q      How do you know he had no liability

3     insurance?

4          A      Because the law enforcement in Brown

5     County wouldn't check.

6          Q      How do you know he didn't have it is my

7     question?

8          A      Well, I don't know.  The law wouldn't

9     do anything for me.

10         Q      You assume he didn't have it?

11         A      I know he didn't have it.

12         Q      How do you know that?

13         A      I'm saying he didn't have it.

14         Q      But you don't know?

15         A      But I don't know.

16         Q      All right.  So you're saying he didn't

17    have it.  Let's talk about the claims that are left in

18    this case we're here on today.  Okay.  Let's try and

19    limit ourselves for the next few minutes talking about

20    that.  All right?

21         A      Go ahead.

22         Q      It's my understanding you claim that

23    some of your rights were violated on October 11th of

24    2000.

1        A     That's correct.

2        Q     What rights?

3        A     U.S. constitution, one, my freedom of

4 speech.

5        Q     Let's talk about each one

6 independently.  How was your freedom of speech

7 violated?

8        A     The cop said you're not allowed to tell

9 me to get the fuck out of your house, and I surely am.

10 If you don't like what I'm saying in this house, you

11 get the fuck out.  Pretty simple.

12        Q     Do you think it would be easier to talk

13 about everything that happened on that night and then

14 we'll go back over your rights?  Might that be

15 simpler?

16        A     Whatever.

17        Q     Let's try that.  Let's start the

18 evening of October 10th at 2000.  Before midnight

19 obviously I'm talking about.

20        A     Right.

21        Q     What was happening that evening?

22        A     I have no idea.

23        Q     What time did you go to bed?

24        A     About 8:00.

56

1      Q      Was that your normal bedtime?

2      A      Yeah, uh-huh.

3      Q      How were you awoke?  What made you wake

4   up?

5      A      It wasn't -- this didn't occur until

6   10-11.  You said the 10th, didn't you?

7      Q      I did.  I think you were arrested on

8   the morning of October 11th; correct?

9      A      Wait a minute.  Let's back up.  I

10  called the sheriff's department at 12:20 a.m.

11     Q      What day?

12     A      On 10-11 2000.

13     Q      But you had gone to bed that evening on

14  October 10th?

15     A      Nothing was happening at that time.

16     Q      I understand.  What time did you wake

17  up?

18     A      Just before 12:20 because I had to have

19  time to call the cops.

20     Q      So you had gone to bed 8 p.m. the

21  previous night?

22     A      Uh-huh.

23     Q      And you woke up around 12:20 a.m --

24     A      That's right.

1      Q    -- on October 11, 2000?

2      A    Correct.

3      Q    What woke you up?

4      A    Barking dogs.  Not one but two.

5      Q    And where were these barking dogs

6 located?

7      A    7021 State Route 221.

8      Q    Now, are you familiar with these two

9 specific dogs?

10     A    I learned about the dogs.  I know where

11 they were tied.

12     Q    How do you know they were tied up that

13 evening?

14     A    They were tied because when I came in

15 the back door that evening, the dogs were laying on

16 the front porch tied.

17     Q    To a neighbor's house?

18     A    Yes, at the neighbor's house.

19     Q    How far away is that neighbor's house

20 from your house?

21     A    From my house, from where I entered my

22 back door, 50, 55 feet, 60 feet.

23     Q    Pretty close?

24     A    Oh, yes.  No tree obstructions.

1    Q    What were they tied to?

2    A    The post on the back porch.

3    Q    You wear glasses; correct?

4    A    Yes.

5    Q    How long have you worn glasses?

6    A    Twenty-five years.

7    Q    What's your prescription?

8    A    I have absolutely no idea.

9    Q    How often --

10   A    I am 20/20 corrected.

11   Q    How often has it been corrected,

12   changed, your prescription?

13   A    About three years ago the VA changed

14   them, yeah.

15   Q    So you saw there were a couple of dogs

16   tied to this, was it a trailer porch?

17   A    Trailer, that's right.  It was a

18   trailer.  The were new people.  Didn't have any idea

19   who they were.

20   Q    Had you ever spoken to those people

21   before?

22   A    No.

23   Q    How long had they lived there?

24   A    Just had moved in.

1    Q  How long before?

2    A  I don't know.  A couple of days.

3    Q  So you awoke around 12:20?

4    A  Yes.

5    Q  Did you go next door and ask your

6 neighbors that you didn't know yet?

7    A  No, absolutely not.

8    Q  Why not?

9    A  Because of the fighting and bickering

10 back and forth with Flora Prather.

11    Q  Flora didn't live there; correct?

12    A  No, no, no.  She lived up the street.

13 She rented it.

14    Q  So why didn't you go ask these

15 neighbors at 7021 State Route 221 about their barking

16 dogs you heard?

17    A  Why would I do that?  That's the

18 sheriff's job.

19    Q  Didn't want to be a good neighbor or

20 anything like that to these people?

21    A  Had no idea who they were.  I just

22 figured it was some more welfare bums, and I was

23 absolutely correct.

24    Q  You knew they were welfare bums, as you