1    call them, before that evening?

2         A      No, not before that evening.

3         Q      So why didn't you go over?  You didn't

4    want to?

5         A      Afraid.

6         Q      For what reason were you afraid?

7         A      Flora Prather.

8         Q      What about Flora Prather made you

9    afraid?

10        A      She's crazy.  I mean, with a gun she's

11   crazy.

12        Q      Have you ever had any criminal charges

13   filed against you because of things you have done to

14   Flora Prather?

15        A      Because of what?

16        Q      Anything you've done to Flora Prather.

17        A      No.

18        Q      So you didn't go next door?

19        A      Did not.

20        Q      You called the sheriff?

21        A      Called the sheriff to enforce the law

22   and they didn't do it.

23        Q      What do you believe -- at 12:20 a.m.

24   what did you tell the sheriff's department?

1        A      I didn't tell the sheriff's department

2   anything.  I called the dispatcher's office at the

3   communication center.

4        Q      Okay.  What did you tell them?

5        A      I told them that the dogs were barking

6   and it was in violation of 2917.11 of the revised

7   code.

8        Q      One second.  When you're going to throw

9   in numbers, I got to ask you what you mean.  What do

10  you believe 2917.11 is?

11       A      The Ohio Revised Code on nuisances.

12       Q      And what do you believe?

13       A      Excessive noise.

14       Q      Okay.

15       A      And Chapter 3767.13.

16       Q      Of the Ohio Revised Code?

17       A      Revised code.

18       Q      All right.  When you called, this isn't

19  the first time you called this dispatch center, right,

20  the call center?

21       A      All calls go to the dispatch center.

22       Q      So it's not the first --

23       A      Communication center.

24       Q      This evening would not have been the

62

1    first time you called there?

2          A    No.

3          Q    You've called there numerous times;

4    correct?

5          A    Yes.

6          Q    Did you always quote when you would

7    call there different sections of the revised code?

8          A    Yes, because the police didn't know

9    what it was, so I had to tell them.

10         Q    So you called and said there were these

11   violations going on?

12         A    Yes.

13         Q    And what did you ask to be done?

14         A    Send an officer down here and put a

15   stop to it.

16         Q    Now, you said these people only lived

17   there for a couple days?

18         A    Yes.

19         Q    Had there been barking dogs at this

20   same address before?

21         A    Yes.

22         Q    Before that day?

23         A    Yes.

24         Q    Had you called for barking dogs at that

1    address?

2         A    Yes.

3         Q    But different people?

4         A    Correct.  Because they moved in and

5    out.  See, you got to understand one month's rent and

6    a security deposit you can move in.  No problem.

7         Q    What happened then?

8         A    Nothing happened.  They wouldn't

9    enforce the law.

10        Q    Do you know if the sheriff drove by?

11        A    They claimed that they drove by, but,

12   you see, again, that claim of driving by doesn't do

13   any good because my house is 90 feet from the road.  I

14   don't know which direction he was going, so it could

15   possibly be 18 feet more than that if he was going

16   northbound.  The back of the house is another 28 feet

17   back there, and like Deputy Snyder said, the dog was

18   barking in your backyard.  It was midnight, after

19   midnight, how in the world would he know that?

20        Q    Let's try to keep this to my questions

21   and it will go maybe a little more smoothly.  You

22   called at 12:20 a.m.?

23        A    That's correct.

24        Q    Do you know whether an officer came by

1      your residence?

2              A      No idea.  No, I do not.

3              Q      You're not saying they didn't.  You

4      don't know?

5              A      I don't know.

6              Q      When did you next contact the sheriff's

7      department that evening?

8              A      About 1:25 a.m.

9              Q      So roughly an hour later?

10             A      That's correct.

11             Q      Same call center?

12             A      Correct.

13             Q      And what did you tell them at that

14     point?

15             A      Same quotation on the Ohio Revised Code

16     2917.11 and 3767.13 of the revised code.

17             Q      All right.  And what did they tell you

18     then?

19             A      Nothing.  They didn't tell me anything.

20             Q      All right.  So you asked that another

21     car be sent out?

22             A      Oh, yes, uh-huh.

23             Q      When you made these calls, were you

24     polite to the call center people?

1        A     I figured I was, yes, sir.

2        Q     Did you swear at them?

3        A     No, never.

4        Q     Not during those two calls at least?

5        A     That's right.

6        Q     Do you know if a sheriff's deputy or

7 anyone else came by again?

8        A     No idea.

9        Q     What happened next?  Between 12:20 and

10 1:25 did go back to sleep?

11       A     Dozing.

12       Q     Were the same two dogs the ones

13 barking, could you tell?

14       A     Yes.  Being two different breeds of

15 dogs, there was a difference in sound.

16       Q     I meant those two dogs as opposed to

17 dogs at other places?

18       A     Definitely.

19       Q     What happened then?

20       A     4:22 a.m. --

21       Q     Roughly three hours later?

22       A     Yes.  I called the third time and

23 that's when the dispatcher, Angela Snyder, that's the

24 deputy's wife, said that he was down there and the

1    only dog barking was in my backyard.  I said something

2    to the effect of, what, I said, I don't even own a

3    Goddamn dog.

4            Q    Why were you swearing at Angela Snyder?

5            A    Because she got under my hide.  She's

6    saying that he reported back to her.  He's supposed to

7    report to the sheriff's office.  You heard the tape.

8            Q    Do you know that he did not report to

9    the sheriff's office what he found?

10           A    No, I don't know if he did go report to

11   the sheriff's office, but he reported back to his

12   wife.

13           Q    Well, he reported back to a dispatcher;

14   right?

15           A    He reported to his wife who was a

16   dispatcher.

17           Q    Correct.  And that was in response to

18   another call from you; correct?

19           A    That's correct.

20           Q    So according to Angela Snyder, Deputy

21   Snyder had come by your house and investigated?

22           A    Right.

23           Q    And you don't have any information to

24   lead you to believe otherwise; correct?

1          A      Correct.

2          Q      So what happened then?

3          A      She said that the sheriff told her they

4     were not supposed to respond to barking dogs.  Just

5     turn it over -- take the information down and turn it

6     over to the dog warden the next day.

7          Q      Okay.

8          A      Well, it doesn't do any good either

9     because the dog warden can't enforce it.

10         Q      Why not?

11         A      Because he can't enforce chapter 3767.

12         Q      Says who?

13         A      Says 955.12 of the revised code.

14         Q      Which says what?

15         A      Which says he's supposed to make an

16    inventory of every dog in the county, the dog warden,

17    every dog in the county, be sure it's licensed and so

18    forth, and they didn't do it.

19         Q      And you know they didn't do it for what

20    reason?  How do you know that, that hadn't been done?

21         A      Because I couldn't go to the dog pound

22    and/or animal shelter, if you will, I couldn't go

23    there and get any information.  I had to go to the

24    auditor's office to find out if dogs were licensed.

1        Q      Where the records were kept?

2        A      That's correct.  No, no, no.  No,

3   wrong, wrong.  The record was supposed to be kept by

4   the dog warden.

5        Q      All right.  The record -- you got

6   records on licensed dogs from the auditor's office of

7   Brown County?

8        A      Did I -- I didn't catch everything.

9        Q      That's okay.  You got records on

10  licensed animals from the Brown County auditor's

11  office?

12       A      Yes, I did, uh-huh.

13       Q      When did you get that information?

14       A      On various occasions.

15       Q      Over the years?

16       A      Yes, that's correct.

17       Q      So let's talk now we're back to October

18  11th of 2000.  You called again at 4:22 a.m.?

19       A      Correct.

20       Q      What happened then?

21       A      We must backtrack to the first call at

22  12:20 a.m. wherein I told Luther, that would be Shawn

23  Luther who was the dispatcher, he asked me for my

24  phone number, which I gladly gave him, and I said, you

1    don't have them call me down here, you have them come

2    down here.  Meaning the sheriff's department.

3        Q    You believe you have the authority to

4    tell the sheriff or sheriff deputy where to go?

5        A    They're the dispatcher.  They're

6    supposed to get the information to the sheriff's

7    department.

8        Q    I understand.  But do you believe you

9    have the authority to order someone who is either a

10.   deputy sheriff or sheriff where to go?

11       A    I didn't want him calling me for any

12   reason.  I wanted him to enforce the law.

13       Q    Why didn't you want him calling you?

14       A    And be disturbed again?

15       Q    Sounds like you were already up at

16   these different times.

17       A    Obviously I was up.

18       Q    Why didn't you want him calling you?

19       A    He had no reason to call me.  The

20   problem was at 7021.

21       Q    You said you wanted him to come down

22   and see you.  Would that have disturbed you again as

23   well?

24       A    What do you mean?

1    Q    That's what you just said.  You didn't

2    want them to call you; you wanted them to come down

3    there and see you.

4    A    That's right.

5    Q    So you would have been disturbed again

6    by that.

7    A    But I'm the complainant and the

8    complaint was at 7021.

9    Q    That's not my question.  You asked the

10   sheriff's deputy to come down and see you; correct?

11   A    Yes, I did.  Third call.

12   Q    Now, earlier you just said that you

13   didn't want him calling you because you didn't want to

14   be disturbed again.

15   A    That's right.

16   Q    How is it different if he calls you and

17   disturbing you or comes to your house and disturbs

18   you?

19   A    Because I invited him to the house.

20   Q    What's the difference -- as far as

21   disturbing you goes, you're being disturbed both ways;

22   correct?

23   A    I am being disturbed because he won't

24   enforce the law.

71

1          Q      I don't think you're answering my

2    question.  If he calls you, you have to respond,

3    correct, there's a ringing phone?

4          A      I did hear the phone and I don't know

5    how I heard the phone because I'm hard of hearing.

6          Q      And if he came to your house, he would

7    have to knock on your door or ring your doorbell?

8          A      That's right.

9          Q      Let's talk about 12:20 still.  Is there

10   any other detail of that conversation you can recall

11   so we don't have to go back to it again?

12         A      Other than the fact I said don't have

13   him call down here, have him come down here.

14         Q      All right.

15         A      No, I don't recall anything else.  It's

16   all on the tape.  We'll play it.

17         Q      The 1:25 a.m. telephone call, is there

18   anything else you can recall about that phone call?

19         A      I have no idea if he showed up or not.

20         Q      Do you recall anything else from the

21   phone call itself that we haven't talked about?

22         A      No, I can't think of anything just

23   offhand.

24         Q      Now we're at, I believe, the 4:22 a.m.

72

1    phone call; correct?

2            A     What about it?

3            Q     Is this the next phone call?

4            A     That would be the third one, that's

5    true.

6            Q     All right.  You called that time and

7    you spoke to Angela Snyder?

8            A     That's right.

9            Q     And I think you told us the beginning

10   of that conversation already.

11           A     Right.

12           Q     What happened then?

13           A     She said the sheriff said not to

14   respond, they won't respond to dog calls because that

15   was to be turned over to the dog warden.  The dog

16   warden doesn't work at night.

17           Q     What happened then?

18           A     They just don't enforce the law.

19           Q     What happened that night, what happened

20   next?

21           A     I heard an engine pull in the driveway,

22   big engine, so I knew who it was.

23           Q     Who was it?

24           A     The sheriff.

1    Q    Have you told us all of the

2  conversation as you recall it during the 4:22 a.m.

3  phone call?

4    A    I told her I didn't own a Goddamn dog

5  because she said the only dog barking was in your

6  backyard, and I didn't even own a damn dog.

7    Q    Did you talk to Deputy Snyder during

8  that phone call?

9    A    No.  He called me afterwards.

10    Q    Is this after you heard the engine or

11  before?

12    A    Before.

13    Q    Let's talk about that call.

14    A    All right.

15    Q    You got a call from Deputy Snyder?

16    A    That's right.

17    Q    How did you answer the phone?

18    A    What the hell can you want?

19    Q    That's how you answered the phone?

20    A    That's right.

21    Q    Do you have caller I.D. at your house?

22    A    No.

23    Q    What was said then?

24    A    He said, this is Deputy Schneider, I

1    can hear Schneider, it's Snyder, S-n-y-d-e-r, from the

2    sheriff's department.  I said, what the hell is wrong

3    with you?  Isn't nothing wrong with me.  What's wrong

4    with you?

5         Q    We got to slow down a little bit.  Why

6    did you ask him what was wrong with him?

7         A    Why he wouldn't go next door.  He never

8    did go there.

9         Q    You don't know that.  You already told

10   me you're not sure.

11        A    I can't get a police report that he

12   went there.

13        Q    Sir, you told me you don't know if the

14   police went by that residence next door or not on the

15   evening of October 11, 2000; correct?

16        A    But going by doesn't do the job.

17        Q    That's not -- fine.  You don't know if

18   they went by there or not?

19        A    I have no idea if they went by there.

20        Q    So you just said he never went by there

21   but you don't really know?

22        A    I don't know that.

23        Q    Let's talk about things you know

24   instead of things you're guessing about.  That's what

1    I need to know is what personal memory you have.

2              You're on the telephone.  What happened

3    then?  What was said next?

4         A    I told him to get his ass down there

5    and enforce the law or something to that effect.

6         Q    Do you make a habit of swearing at la

7    enforcement officers?

8         A    When I am upset, you better betcha.

9         Q    Okay.  We'll talk about 1998 another

10   time.  But so what happened then?

11        A    I hung up on him.

12        Q    All right.

13        A    And then, of course, he tells his wife,

14   he says, call that mother fucker back.  Call that cock

15   sucker back, which is on the tape and you heard it.

16   And he called me a second time.  So I tongue lashed

17   him and hung up again.

18        Q    What do you mean tongue lash?

19        A    I called him a no good son of a bitch

20   and told him to get his ass down there and enforce the

21   law, or something to that effect.

22        Q    Okay.  What happened next?

23        A    I heard that big engine pull in the

24   driveway and I knew what it was, that it was the

1    sheriff, and I walked to the door and there happened

2    to be two of them.

3            Q       Do you know who they were?

4            A       It would be Larry Meyer and Chris

5    Snyder.

6            Q       Now, had you ever met either of those

7    deputies before that day?

8            A       I'd never met Snyder before, no.

9            Q       How Larry Meyer?

10           A       I knew Larry Meyer just to talk to

11   because he had been down to my garage sitting arou:

12   loafing.

13           Q       Why was he at your garage loafing?

14           A       Because he wasn't doing his job.

15           Q       Okay.  When was he at your garage?

16           A       I don't remember that date.  It was up

17   in the pretty time of year.  All the windows were

18   open.  He came in the garage about the barking dogs

19   down there at the welfare bum down below me and I

20   said, why don't you go down there and arrest him for

21   that?  I said, 2917.11 says you can.  He said, let me

22   look that up.  I had the criminal law handbook laying

23   there, which he looked it up and he said, yeah, I

24   guess I can do that.  He never did.

1         Q    So you met Larry Meyer how long before

2  October 11th of 2000?

3         A    Oh, gosh, I don't know what year that

4  was.  It was before Dwayne Wenninger became sheriff.

5  He became sheriff in 2000.  So it was sometime before

6  that.

7         Q    When Larry Meyer came to your garage,

8  he was doing so because some calls you had made?

9         A    Yes.

10        Q    You said he was loafing.

11        A    Well, that's what he wound up doing.

12  He had been down there about the dogs.  Then he came

13  back up there to talk to me.  This gives him an

14  opportunity to goof off the rest of the evening.

15        Q    So they came to your door.  Did they

16  knock?

17        A    Oh, yes, they knocked at the door, and

18  I invited them in.

19        Q    What happened then?

20        A    I told them that they weren't enforcing

21  the law under 2917.11 and Chapter 3767 of the revised

22  code, and they didn't like me to tell them that.  And

23  I said, if you're not going to do anything about it,

24  get the fuck out of my house.

1          Q      Slow down a little bit.  She's trying

2     to take down everything you say.  You're talking

3     really fast.

4          A      I'm sorry.

5          Q      So they told you what?  You told them

6     to enforce the law as you understood it, and what did

7     they say?

8          A      He placed me under arrest.

9          Q      There was no other conversation?

10         A      Not to my recollection.

11         Q      Sir, isn't it true that you started

12    swearing at the officers?

13         A      Yes.

14         Q      Why did you do that?

15         A      Here again now --

16         Q      No, no.  Stick with my questions.  Why

17    did you do that?

18         A      Because they weren't going to do

19    anything, and I could sense it.

20         Q      You could -- how could you sense it?

21         A      That they were just do-less, because

22    they are do-less people.

23         Q      They are what?

24         A      Do-less.

1    Q    I'm sorry.  You could just sense they

2    weren't going to do anything?

3    A    That's correct.

4    Q    So you started swearing at them?

5    A    Wait a minute.  When I opened the door,

6    I said, do you hear the dogs barking?  I invited them

7    in.  Now, they deny that the dog was ever barking,

8    dogs, I beg your pardon, that's plural.

9    Q    Okay.

10    A    So I told them to get the fuck out of

11    my house.

12    Q    Do you recall any other conversation?

13    A    They told me I was under arrest.

14    Q    Did you approach the officers as you

15    were talking to them?  Did you -- are you a person who

16    gestures a lot when you get upset?

17    A    No.  Have you seen me gesturing?

18    Q    I'm asking if you generally do that

19    when you're upset?

20    A    Do not.

21    Q    Do you recall gesturing at the officers

22    at all?

23    A    No.

24    Q    How close were you when you were

1   swearing at them?

2        A    Let's see, I was on the davenport and

3   they were standing in the living room.  So that would

4   be what, 11, 12 feet away.

5        Q    Were you -- had you raised your voice

6   or were you talking in a voice like you're talking

7   now?

8        A    I was probably raising my voice because

9   they weren't doing anything.

10        Q    So you were yelling at them; is that

11   fair to say?

12        A    All right.

13        Q    Is that fair to say?

14        A    Yes, okay.

15        Q    And you're swearing at them; correct?

16        A    No, there's no swearing.  There's

17   nothing to show that I was swearing at them.

18        Q    But you were, you told us that;

19   correct?

20        A    No, no.  I'm not admitting I was

21   swearing at them.  I'm saying that I told them to

22   enforce the law or get the fuck out of my house.

23        Q    Sir, are you telling me you were not

24   swearing at the deputies when they were inside your

81

1    house?

2              A     Show me what words --

3              Q     I'm asking you if you were swearing.

4              A     No, I was not swearing at them.  I

5    wasn't berating them either.

6              Q     You understand you are under oath;

7    correct?

8              A     I do.

9              Q     So you told them to get out of your

10   house and used some colorful language?

11             A     Correct.

12             Q     What happened then?

13             A     They placed me under arrest alleging

14   persistent disorderly conduct.

15             Q     What did they do when they placed you

16   under arrest?  How did they arrest you?  Describe

17   where you were and exactly what happened in as much

18   detail as you can.

19             A     I believe I was standing at that point.

20   I had told them to get out.  He placed me under

21   arrest, Snyder placed me under arrest.

22             Q     How did he do that?  Did he say, you're

23   under arrest?

24             A     He said, you're under arrest.

82

1       Q       Did he say anything else?

2       A       For persistent disorderly conduct.

3       Q       He told you that right then?

4       A       That's right.

5       Q       All right.  What did you say?

6       A       I said, I got to get dressed.  He said,

7    go ahead and get dressed.  I went to the dryer and

8    picked up my clothing.

9       Q       Okay.

10      A       But they didn't look at my caduceus.

11   Caduceus is the correct pronunciation on that.

12      Q       What is that?

13      A       Those are medical alerts.

14      Q       Were you wearing a shirt when you first

15   invited them in?

16      A       I was in my skivies when I answered the

17   door.

18      Q       Is that a shirt?

19      A       T-shirt and boxer shorts, that's right.

20      Q       Where was your medal at that point?

21      A       Hanging around my neck just like it is

22   today.

23      Q       Tucked inside your T-shirt?

24      A       No, hanging out.  See, when you're in

1    bed, it always comes out.

2        Q    Okay.  So as they're talking to you and

3    telling you you are under arrest, you said you wanted

4    to go get your clothes?

5        A    I had to get my clothes.

6        Q    Did they allow you to do that?

7        A    Let's see, Snyder said, you don't need

8    your stockings on, forget those.  Just come on.  I

9    said, oh, no, you don't.  I said, I can't go out in

10   this cold weather like this.  So finally --

11       Q    You went and got your clothes?

12       A    Got my clothes.

13       Q    Pants and shirt?

14       A    Pants, shirt, field jacket and hat and

15   walked out the door, closed the door and locked it,

16   made sure it was locked.

17       Q    Did they handcuff you inside your

18   house?

19       A    No.

20       Q    You mentioned your metal that was

21   hanging around your neck.  Did you bring it up to the

22   officers?  Did you point it out to them?

23       A    They were hanging right there.  They're

24   investigating.

1        Q    Sir, did you point out the fact that

2   you had that metal around your neck?

3        A    I didn't have to.

4        Q    Did you?

5        A   Did not.

6        Q    So did you mention to the officers

7   while they were in your home that you had medications

8   that you needed?

9        A    Absolutely.  They were sitting right on

10   the coffee table.

11        Q    I didn't ask you where they were

12   sitting.  I asked you if you told the officers, I need

13   to take my medication with me?

14        A    No, I don't recall saying that I had to

15   take them with me.  I don't recall that, no.

16        Q    So they --

17        A    They were in plain sight.

18        Q    I don't care.  I'm asking you, you

19   didn't bring it to their attention and they took you

20   outside?

21        A    No, no.  I had a fresh prescription in

22   my field jacket and I pulled it out as we were getting

23   ready to leave and I laid it on the coffee table and

24   all the other medications were sitting there.

1          Q      Okay.

2          A      And they picked that bag up and looked

3    at it, laid it back down and then they said I never

4    told them that I had -- I needed any medications.

5          Q      And you just told me you never told

6    them that; correct?

7          A      I didn't tell them that in the hous

8    but they're writing that they didn't.

9          Q      You didn't tell them anything about

10   your medications while they were in your house;

11   correct?

12         A      I didn't have to.  They were visible.

13         Q      And you didn't tell them anything about

14   the medications while you were in your house; is that

15   right?

16         A      These speak for everything.  These two

17   medical alerts say, hey, take a look at me, I'm a sick

18   guy.

19         Q      Okay.  Can we stick with my questions?

20   And if you want at some other point just to talk,

21   that's fine.  Let's stick with my questions.

22                Did you verbally say to either officer

23   anything about your medications on the morning of

24   October 11, 2000 in your house?

1          A     I don't recall saying anything to them

2     about it, but they were investigating, therefore, they

3     should have seen it.

4          Q     All right.  Who picked up the bag?

5          A     Snyder.

6          Q     So what happened then?  They walked

7     with you out to the police car?

8          A     Yes.

9          Q     Did they place you in handcuffs at any

10    point while you were walking out?

11         A     No.

12         Q     Did they place you in handcuffs before

13    he put you in the car?

14         A     No.

15         Q     Were you placed in the police car?

16         A     Yes.

17         Q     What other conversations did you have

18    with the officers while you were in the police car

19    before you left your property?

20         A     I asked them if I could go back and

21    turn off the porch light because they had forgot to do

22    it.

23         Q     Did they say you could?

24         A     No, they would not permit it.

87

1      Q      What happened then?  Were you

2   transported to the jail?

3      A      Transferred to the jail.  En route I

4   told it them I had to have my medications.

5      Q      Who did you tell?

6      A      Snyder.  My blood pressure was up, I

7   needed to go to the hospital.

8      Q      You told them you needed medications or

9   you needed to go to the hospital or both?

10     A      Both.

11     Q      What happened then?

12     A      That's on that tape.

13     Q      What's on what tape?

14     A      On that tape, that micro-recording of

15  Snyder's as we went to Georgetown.  And he said

16  something to the effect of, we'll assess or access,

17  I'm not sure which he said, your medical condition and

18  then we will determine if you need to go to the

19  hospital.  There wasn't anyone at the sheriff's office

20  with a lick of intelligence that could assess or

21  access any medical.

22     Q      So how long did it take between the

23  time you were arrested and the time you arrived at the

24  jail?

1              A       Oh, gosh, I'm going to say as an

2      estimate probably 15 minutes, 17 minutes.  Right in

3      that area.

4              Q       Do you know what time the officers had

5      arrived at your house that morning?

6              A       I have no idea.

7              Q       Fair to say it was after 4:22 a.m.;

8      correct?

9              A       Definitely after 4:22.

10             Q       Do you know if it was before 5:00?

11             A       That, I can't recall.  I do not

12     remember.

13             Q       But within 15 minutes after them --

14     yourself and them leaving your house, you arrived at

15     the jail?

16             A       That would be about right.  That's

17     correct.

18             Q       Were you ever placed in handcuffs at

19     any time prior to arriving at the jail?

20             A       No, no.  He handcuffed me after I sit

21     down in the seat there at the house.

22             Q       At the house, your house or the jail?

23             A       No, in his car.

24             Q       Okay.

1          A     When I sit down in the car, he said,

2   here, I better handcuff you, which he did.

3          Q     Did he handcuff both hands together?

4          A     Yes.  Typical.

5          Q     In front of you?

6          A     Right.  Because he knew about my bac!

7   problems.

8          Q     Had you told him about your back

9   problems?

10         A     I don't recall if I did or not.  He

11   handcuffed me in front.  That's in violation of all

12   the rotary code of ethics of the jail that everybody

13   will be handcuffed in the rear.

14         Q     Would you have preferred that he --

15         A     That's the policy.

16         Q     Would you have preferred he handcuffed

17   you in the rear?

18         A     Oh, I would have screamed like a mashed

19   cat.

20         Q     So it would not have been good for you

21   to be handcuffed in the rear?

22         A     Absolutely not.

23         Q     So then you're transported to the jail.

24   Do you recall any other conversation you had with

1    Deputy Snyder on the ride to the jail?

2          A    No, I can't.  No, I can't.

3          Q    You said -- do you have some kind of

4    tape recording of the ride to the jail?

5          A    I received from John Hapner, who was my

6    counsel at that time, I received a tape recording,

7    this micro-tape recorder that Snyder had that was so

8    jumbled up that you couldn't make heads or tails of

9    what was being said except for one small portion, and

10   I played that for you but you were in such a hurry to

11   leave when we were there on the 18th you didn't hear

12   it all.  Anyway, that's when he said something about

13   assessing or accessing your medical --

14         Q    Okay.

15         A    -- to see if you need to go to the

16   hospital.

17         Q    So you were taken to the sheriff's

18   department?

19         A    Correct.

20         Q    The jail.  What happened there?

21         A    I was divested of all my worldly goods.

22         Q    Okay.

23         A    I knew I had a couple hundred dollar

24   bills in my pocket.  I typically don't trust deputies

1    or the correction officers.

2           Q    Why not?

3           A    They are not to be trusted.

4           Q    Why?

5           A    Because I don't trust them.  Period.

6           Q    How come?

7           A    Anyway --

8           Q    One second.  Why don't you trust them?

9           A    Because they won't enforce the law, so

10   why should I trust them.

11          Q    All right.

12          A    I knew I had $200 in my pocket plus

13   some other bills.  So when you look at the booking

14   record, I had $250 in my pocket and I couldn't get

15   bail, nor would they call my attorney.

16          Q    Wait a minute.  You hadn't been

17   arraigned yet; right?

18          A    That's correct.

19          Q    What does bail have to do with

20   anything?

21          A    I wanted out on bail.

22          Q    Before you were arraigned?

23          A    Why not?  Sit up there in that stinking

24   jail.

1          Q      I understand you were taken to the

2    hospital that morning.

3          A      That's correct.

4          Q      How long after you originally arrived

5    at the jail, how long was it until you were taken to

6    the hospital?

7          A      I have no idea.  There's no clocks.

8          Q      Was it still dark?

9          A      Definitely still dark.

10         Q      Can we agree it probably was before

11   7:30 a.m.?

12         A      That would be reasonable.

13         Q      When you were taken to -- which

14   hospital?

15         A      Brown County General.

16         Q      So that we kind of at least make it a

17   little clear on the record.  Did anything else of any

18   significance happen at the jail before you were taken

19   to the hospital?

20         A      Well, I told them I needed my morning

21   medications.  I told the corrections officers that.

22         Q      All right.  This is while you were at

23   the jail before you were taken to the hospital; right?

24         A      Uh-huh.  Correct.

93

1       Q      Now, you say in your complaint that

2   while you were at the jail, the deputies offered to

3   have a neighbor go to your house and get medication.

4       A      I don't say that.

5       Q      Well, let me just read something to

6   you.  Page 6 of your complaint under Count 6 you say:

7   Plaintiff was permitted a phone call under ORC Section

8   2935.14.  Plaintiff told these two officers he needed

9   his morning prescription medication.  They then

10  offered the plaintiff a second phone call to get his

11  medications.  However, both officers were willing to

12  sacrifice plaintiff's security while confined and the

13  security of his home and property by giving his keys

14  to his neighbor friend so he could pick up plaintiff's

15  medications and bring them to the jail, in violation

16  of the security plaintiff would expect from law

17  officers.  Is that what happened?

18      A      I have no idea what happened.

19      Q      Sir, is that your complaint?

20      A      That sounds correct.

21      Q      All right.  Starting right here, go

22  ahead and read that.

23              Let's go off the record.

24                    - - -

94

1              Discussion held off the record.

2                      -  -  -

3    By Mr. Vincent:

4          Q      Did you just read a portion of your

5    complaint, Page 6 under Count 6?

6          A      I did.

7          Q      What does that mean?

8          A      It means that they would have had to

9    sacrifice the security of my home and outbuildings by

10   giving the keys to my neighbor.

11         Q      Did that ever happen?

12         A      Not to my knowledge it never did

13   happen.

14         Q      All right.  So when you say in your

15   complaint that it happened, you're just saying that's

16   what could have happened; right?  I'm trying to

17   understand your complaint a little bit here.

18         A      It may not be as well written as it

19   should have been.

20         Q      What does that mean?

21         A      I could have done that a little bit

22   better because they say -- the deputies now say in

23   their November 6th and November 15th, 2002 that a

24   neighbor picked up the medications.  How would a

1    neighbor know what medications to pick up?

2         Q    What deputies say that?  Are you

3    referring to the motion we've talked about at the

4    various status conferences, the motion for summary

5    judgment?

6         A    No, the affidavit of Snyder and Meyer.

7         Q    Neither officer says that.

8         A    Sure they do.

9         Q    No.  But to your knowledge, no one ever

10   went to your home and got any medications for you;

11   correct?

12        A    How could they possibly get them?  I

13   have no idea.

14        Q    All right.  You have no idea either

15   way?

16        A    I know I didn't get any.

17        Q    All right.

18        A    That I do know.

19        Q    All right.  And as far as you know, no

20   neighbor went to get your medications; right?

21        A    That's correct.

22        Q    When you went home on October 11th of

23   2000, were your medications still sitting where you

24   had placed them before you left?

1    A    Of course they would be.

2    Q    All right.  Because no one moved them.

3    That's why they would be; right?

4    A    Wait a minute.  You are not reading

5    that correctly.  Let's go back to their affidavit.

6    Q    No.  We're going to talk about your

7    complaint.  I'm asking you very specific questions.

8    Were your medications in the same place they were when

9    you left when you got home?

10    A    That's right.  Because I never got any

11    at the jail.

12    Q    All right.  What else happened at the

13    jail?  Anything while you were booked?  Everything

14    else go smoothly?

15    A    I don't even understand that question.

16    I'm in a stinking jail, and I do mean literally a

17    stinking jail.  I'm cold, I'm hungry.  I didn't get my

18    medications.  My blood pressure is sky high.  At that

19    time of the morning there was nobody at the sheriff's

20    office to give me my medications if the neighbor would

21    have brought them.

22    Q    What time were you required -- I

23    believe this was 5 a.m. or so in the morning when you

24    arrived at the jail; correct?

97

1        A      Upon arising.

2        Q      What time do you normally get up in the

3   morning?

4        A      6:00, 7:00.

5        Q      Fair to say between the hour of 8 p.m.

6   and 6:00 or 7:00 in the morning you would not normally

7   take medication because you're sleeping; right?

8        A      Well --

9        Q      Is that right?

10       A      No.  I take my medications upon

11  arising.

12       Q      You normally arise at 6:00 or 7:00?

13       A      6:00 to 7:00.  Usually it's 6:00.

14       Q      That is when you would normally take

15  your medications?

16       A      Correct.

17       Q      So what time did you arrive at the

18  hospital that morning?

19       A      I have no idea.

20       Q      I think we already said it was before

21  7:00; correct?

22       A      We would agree that would be reasonable

23  because it was still dark.

24       Q      Did you receive any medications at the

1    hospital?

2         A    No.

3         Q    Did you ask for any?

4         A    Yes.

5         Q    Why didn't they give you medications?

6         A    I have no idea.

7         Q    What did they find at the hospital?

8    Were you examined by a physician?

9         A    By a physician and a nurse.

10        Q    What did they find?  Was anything wrong

11   with you?

12        A    No record.  There is no record of me

13   being at the hospital.

14        Q    Do you remember being there?

15        A    Pretty sure I was.

16        Q    Did they tell you anything was wrong

17   with you?

18        A    Said my blood pressure was up, which I

19   already knew that.  I didn't need a doctor or a nurse

20   to tell me that.

21        Q    Then what happened?

22        A    Then the hospital turns around and lies

23   and said, he was never at our hospital.  That's the

24   one we're going to go by.

1          Q      But you believe you were?

2          A      I'm pretty sure I was.  The thing is

3      we're talking about Medicaid fraud -- Medicare fraud

4      now.

5          Q      Who's talking about Medicare fraud?

6          A      I am.

7          Q      Well, this case, sir, I believe is

8      about what you claim to have been some civil rights

9      that were violated.  So let's -- I guess the best we

10     can stick with those allegations because this case

11     doesn't involve Medicare fraud or Medicaid fraud,

12     whatever you said.

13         A      Medicare.

14         Q      So you were taken to the hospital by

15     the sheriff's department; correct?

16         A      Correct.

17         Q      Was there an officer with you in the

18     room while you were examined?

19         A      Yes.  The idiot didn't have enough

20     sense to leave.  There he violated my doctor-nurse

21     privilege.

22         Q      Did you ask him to leave?

23         A      I'm not allowed to tell him anything.

24         Q      Did you ask him to leave?

1      A     I did not.

2      Q     Which officer --

3      A     He is supposed to know to leave.

4      Q     Which officer was it?

5      A     Snyder.

6      Q     So you are in the hospital.  Were you

7 discharged?

8      A     Yes.

9      Q     How did you get to the hospital?

10     A     Life squad from Hammersville, Ohio.

11     Q     Do you know how long you were there?

12     A     No, I have no idea.

13     Q     Did they do any kind of treatment to

14 you?  Did they give you any kind of treatment?

15     A     No medications, but they did my blood

16 pressure and it was elevated.

17     Q     Did they do anything else for you?

18     A     No.

19     Q     They discharged you then back to jail?

20     A     No, they denied my being there.

21     Q     Were you discharged back to the jail?

22     A     Yes.

23     Q     How were you taken back to the jail?

24     A     Snyder's car.

1          Q     Do you recall any conversations you had

2    with Deputy Snyder during either your transport to the

3    hospital or back from the hospital?

4          A     To the hospital he wasn't in the

5    vehicle.

6          Q     All right.

7          A     Coming back, no, I don't recall talking

8    with him.

9          Q     What happened next?

10         A     They put me back in the cell and I

11   don't have any idea what time it was.  I was taken

12   across the street to the courthouse and arraigned.

13         Q     What happened during the arraignment?

14         A     I pleaded not guilty, released on OR

15    bond.

16         Q     Do you recall what time you were

17   released on your own recognizance?

18         A     According to the booking slip, around

19   10:40 or something like that, a.m., that day.

20         Q     That same morning, October 11?

21         A     That's correct.

22         Q     October 11, 2000?

23         A     Correct.

24         Q     Just so that we know exactly what we're

1    talking about here, your arrest occurred sometime

2    between 4:30 and 5 a.m. the morning of October 11,

3    2000?

4           A    Yes.

5           Q    And you remember you were released

6    after arraignment at approximately 10:40 a.m. on

7    October 11, 2000; correct?

8           A    Until the trial came up, that's right.

9           Q    So roughly six hours, give or take?

10          A    Give or take.

11          Q    That's how long you believe you were in

12   custody of the jail and the court; correct?

13          A    No, no.  Just for the arraignment.

14   That's not inclusive of my trial time.

15          Q    I understand.  Now, do you recall a

16   hearing we had with Judge Weber here at the courthouse

17   in November of 2005, do you recall that?

18          A    Do you mean November 18?

19          Q    Yes.  Actually I think it was November

20   3rd, wasn't it?

21          A    We had one on the 3rd and the 18th,

22   that's right.  The most recent was the 18th.

23          Q    Right.  We had one January 18th of

24   2006.

1          A     Right.

2          Q     Do you remember the November 3, 2005

3     hearing with Judge Weber?

4          A     Not in particular.  Go ahead and

5     refresh.

6          Q     I will try.  Do you recall being asked

7     questions about damages that you had?

8          A     Uh-huh.

9          Q     Do you recall those questions?

10          A     Yeah, vaguely.

11          Q     Do you recall -- did you give honest

12     and accurate answers to those questions about your

13     damages during that hearing?

14          A     I would have definitely done that,

15     sure.

16          Q     Just so I don't have to go through

17     everything with you again, is it fair to say that the

18     answers that you gave to Judge Weber during that

19     hearing are accurate and complete to the best of your

20     knowledge?

21          A     Yes.

22          Q     I can rely on the answers you gave as

23     being accurate?

24          A     Fair, that's fair and correct.

1    Q    Feel free to stand up.  I know you have

2  a bad back.  So any time.  Do you need to take a

3  five-minute break?  Would that help you?

4    A    Go ahead.

5    Q    You tell us if you need one.

6    A    Thank you.

7                    - - -

8                    Recess taken.

9                    - - -

10  By Mr. Vincent:

11    Q    If you have -- if you don't understand

12  my questions, I think I already told you let me know

13  that.

14    A    All right.

15    Q    I want you to tell me what you believe

16  your basis is for any claim that you have made that

17  any of the remaining defendants in this case violated

18  your constitutional rights.  Let's talk about each one

19  individually.  Okay?

20    A    Snyder denied me --

21    Q    Let's talk about Deputy Snyder first.

22    A    Snyder denied me my medications in

23  violation of U.S. Constitution Amendment 8, cruel and

24  unusual punishment.

1          Q      You don't have an eighth amendment

2    claim in this case.  You're aware of that; correct?

3          A      No, I --

4          Q      Do you understand that Judge Weber --

5    fourth and first amendment.  Do you recall that?

6          A      No, fourth and fifth, as I recall.

7                        - - -

8             Discussion held off the record.

9                        - - -

10   By Mr. Vincent:

11         Q      What do you believe Deputy Snyder did

12   that violated your first amendment rights, just Deputy

13   Snyder?

14         A      Freedom of speech.

15         Q      Okay.  What did he do to violate your

16   freedom of speech?

17         A      Arrested me.

18         Q      Anything else?

19         A      Illegally had me charged by another

20   deputy who wasn't present.

21         Q      That's your first amendment right?

22         A      Please?

23         Q      We're talking about your first and

24   fourth amendment rights; correct?

1       A     Right.

2       Q     You said that you believe Deputy Snyder

3   violated your first amendment rights by arresting you.

4       A     Uh-huh.

5       Q     Right?

6       A     Correct.

7       Q     What else did he, did Deputy Snyder do

8   to violate your first amendment rights in your opinion

9   or in your belief?

10      A     He illegally had me arrested on a

11  charge under Revised Code 2917.11(A)(2) wherein the

12  constitutionality of the statute is questionable.

13      Q     What are you reading from?

14      A     Hoffman versus Hoffman.

15      Q     I don't -- I want you to talk to me

16  from your own knowledge.  If you want to supplement

17  your answer with anything in writing, we're going to

18  need to go through that.  What are you holding in your

19  hand there?

20      A     Hoffman versus Hoffman.

21      Q     Okay.  May I see the document, please?

22      A     (Providing document.)

23      Q     This appears to be a case called State

24  versus Hoffman, and you were reading from this.  We

1   are talking about Deputy Snyder and your first

2   amendment rights; correct?  What do you believe your

3   first amendment rights are?

4           A       Freedom of speech.

5           Q       Anything else?

6           A       Freedom of assembly.

7           Q       Anything else?

8           A       I can't recall offhand.  I don't have

9   it with me.

10          Q       But when you are talking about it in

11  this case, you are talking about your freedom of

12  speech; is that accurate?

13          A       That's correct.

14          Q       And we're just trying to talk about

15  what you believe each officer or deputy or person did

16  to violate your first amendment rights.  Okay?

17          A       Yes.

18          Q       Deputy Snyder you believe violated your

19  first amendment rights when he arrested you?

20          A       That's correct.

21          Q       Did he do anything else to violate your

22  first amendment rights?

23          A       I don't recall offhand.

24          Q       How about Deputy Meyer, what did he do

1    to violate your first amendment rights?

2         A    These fellows, they didn't read me my

3    rights under Miranda versus Arizona.  That's right.

4         Q    That's not your first amendment rights,

5    though, is it?

6         A    That's correct.

7         Q    We're talking about your first

8    amendment rights.

9         A    I don't recall anything further.

10        Q    What did Deputy Meyer do to violate

11   your first amendment rights?

12        A    Participated in the arrest and in

13   violation of the first amendment.

14        Q    How did he participate in your arrest?

15        A    He didn't stop it, so therefore he was

16   a party of the first part to it.

17        Q    Did he arrest you, Deputy Meyer?

18        A    No.

19        Q    Did he at any point take custody of you

20   at your home?

21        A    No.

22        Q    Other than being at the residence, did

23   he actively participate in your arrest?

24        A    Certainly he did.

1        Q     How?

2        A     He did not tell Snyder back off, leave

3 him alone.

4        Q     Okay.

5        A     So therefore he condoned the arrest.

6        Q     You believe he condoned the arrest?

7        A     Absolutely.

8        Q     Is that the only way he violated your

9 first amendment rights?

10       A     He was just as angry as Snyder was when

11 I told him to get the fuck out of my house.

12       Q     By him being angry, you're not saying

13 he violated your first amendment rights; correct?

14       A     But then he -- they both denied the

15 medications.

16       Q     We will talk about that later.  I am

17 talking about your first amendment rights.  You've

18 made claims in this case.  Let's talk about them.

19            Do you have any other way that you are

20 aware of that Deputy Meyer violated your first

21 amendment rights?

22       A     Not that I can recall offhand.

23       Q     This is your opportunity.

24       A     I say not that I can recall because I

110

1    didn't bring it with me.

2         Q    What did you need to bring with you?

3         A    My constitutional amendments, I forgot

4    to bring those with me.

5         Q    Who is Michelle Hudepohl?

6         A    She's a deputy sheriff.

7         Q    Did Deputy Hudepohl do anything to

8    violate your first amendment rights?

9         A    Not my first amendment.

10        Q    How about Clark Gray, who is Clark

11   Gray?

12        A    Clark Gray is a deputy sheriff.

13        Q    Was Deputy Gray working at the jail on

14   October 11, 2000?

15        A    No.

16        Q    Was he involved in your arrest on

17   October 11, 2000?

18        A    No.  Clark Gray is the one that filed

19   the charges against me, which he is not allowed to do.

20        Q    Did deputy Gray violate your first

21   amendment rights?

22        A    Not per se.

23        Q    What fourth amendment rights of yours

24   do you believe were violated?

1        A     Michelle Hudepohl deposed the probable

2  cause affidavit by Snyder.

3        Q     Wait a minute.  What do you mean she

4  deposed?

5        A     If you read the probable cause

6  affidavit, she signed, that she deposed it.  She's not

7  allowed.

8        Q     Is she a notary public?

9        A     Is she a what?

10       Q     Notary public.

11       A     I have no idea if she is a notary

12  public.

13       Q     How do you believe Deputy Hudepohl

14  violated your fourth amendment rights?

15       A     That would come under 2319.

16       Q     We are not talking about the Ohio

17  Revised Code.  You're claiming that she violated your

18  fourth amendment rights; correct?

19       A     I don't know.  I got to get -- do you

20  have a copy of --

21       Q     I don't.  This is your claim and your

22  complaint.

23       A     Without my amendments, I can't tell

24  you.  I just cannot recall.

112

1      Q      What do you think, tell me everything
2  you think Deputy Hudepohl did wrong.
3      A      She deposed that probable cause
4  affidavit.
5      Q      Anything else?
6      A      That's enough.
7      Q      Anything else?
8      A      The probable cause affidavit is
9  invalid.
10     Q      Did Michelle Hudepohl to your knowledge
11 do anything else that violated your constitutional
12 rights?
13     A      Other than deposing that probable cause
14 affidavit, nothing that I can think of.
15     Q      How about Deputy Gray, did Deputy Gray
16 do anything else to violate your constitutional
17 rights?
18     A      Not that I can recall, but he is the
19 one that filed the charge, which he wasn't allowed to
20 do because he wasn't there.
21     Q      What do you mean he filed a charge?
22     A      He filed the complaint against me.
23     Q      What do you mean by he filed the
24 complaint?  Did he stamp it, did he sign it?

113

1          A     He signed his complaint against me

2     under 2917.11(A)(2), a minor misdemeanor.

3          Q     So is that -- is there anything else

4     you believe Deputy Gray did that violated your

5     constitutional rights?

6          A     That said it all.

7          Q     Nothing else then?

8          A     Nothing else that I can think of.

9          Q     Did Deputy Snyder do anything else to

10    violate your constitutional rights other than arrest

11    you?

12         A     False arrest and false incarceration.

13         Q     We are talking about constitutional

14    rights.

15         A     That's right.

16         Q     You were arrested; correct?

17         A     Correct.

18         Q     And you were arraigned; is that

19    correct?

20         A     No, I was incarcerated, then arraigned.

21         Q     What did Deputy Snyder do that violated

22    your fourth amendment rights?

23         A     I can't recall what the fourth

24    amendment is.

114

1          Q       What else do you think he did wrong?

2          A       I can't recall without my amendment.  I

3     don't have it here handy.

4          Q       Sir, this is your opportunity to tell

5     me what claims you believe you have against these

6     people.

7          A       I would have to have a copy of the

8     fourth amendment in order to speak to you correctly.

9          Q       I just want you to tell me to the best

10    of your knowledge.

11         A       I don't remember.

12         Q       You don't remember?

13         A       I have to have the amendment first.

14         Q       You don't remember what Deputy Snyder

15    did to violate your fourth amendment rights?

16         A       I don't recall.

17         Q       How about Deputy Meyer?

18         A       I can't recall without the amendment.

19         Q       Let's ask it another way.  What else do

20    you think Deputy Snyder did wrong other than what you

21    have already told me, him arresting you?

22         A       Denied me my medications.

23         Q       Anything else?

24         A       That should surely be enough.

1       Q     How about Deputy Meyer, what else did

2  he do wrong besides being present at the time you were

3  arrested?

4       A     He too denied me my medications.

5       Q     How did he do that?

6       A     He could have picked them up off the

7  coffee table and took them.

8       Q     Other than the fact that there were

9  medications in your home that he didn't pick up and

10  take, is there anything else that Deputy Meyer did

11  that you think was wrong?

12       A     Yes, he signed that affidavit that

13  would have taken those medications without a warrant.

14       Q     On October 11, 2000 is there anything

15  else that Deputy Meyer did wrong?

16       A     Not that I can think of without my

17  constitutional amendments.

18       Q     Maybe I don't understand.  What do you

19  need to read a constitutional amendment for to tell me

20  what --

21       A     To refresh my memory.

22       Q     But I'm asking about October 11, 2000.

23  I'm not asking you to quote me anything from the

24  constitution.  I'm asking you what you think they did

116

1    wrong that day and that early morning.  You don't need

2    to read from a book to tell me that, do you?

3              A    I certainly do because --

4              Q    Why?

5              A    -- because I want to get it straight.

6              Q    I just want you to tell me

7    everything --

8              A    I already told you everything.  I've

9    already told you everything.  And without my

10   amendments to the U.S. Constitution, the Ohio

11   Constitution, I cannot proceed.

12             Q    Why not?

13             A    Because I need them to refresh my

14   memory.

15             Q    You need them to refresh your memory as

16   to what they say or as to what happened that day?

17             A    What happened that day.

18             Q    How is a constitutional amendment going

19   to refresh your memory as to what happened October 11,

20   2000?

21             A    What they did.

22             Q    You can't recall what they did without

23   reading it?

24             A    That's correct.

117

```
 1          Q      And you would read it from a

 2   constitutional amendment, that's where you would --

 3          A      That would be my refreshment.

 4   Remember, now, I'm the guy that had three strokes and

 5   a heart attack.

 6          Q      I don't know what that has to do

 7   with --

 8          A      You don't?

 9          Q      I'm sorry.  All I need to know, sir, is

10   to your knowledge is there anything else Deputy Meyer

11   or Deputy Snyder did wrong on October 11, 2000?

12          A      Without my amendments handy, I cannot

13   tell you.  I don't remember.

14          Q      Do you want to take a break?

15          A      No.  I want to get ready to go home.

16          Q      We've got a long time until we're done.

17          A      Well, I am getting very weary of this.

18          Q      It's fair to say you can't tell me

19   right now anything that Deputy Snyder or Deputy Meyer

20   did wrong on October 11, 200?

21          A      I cannot recall.

22          Q      And you have told me as far as you know

23   everything that you believe Deputy Hudepohl and Gray

24   did wrong?
```

1        A     There's probably other things, but I

2 don't recall right offhand.

3        Q     Can you recall being arrested for

4 grabbing ahold of someone while they were taking some

5 pictures of your property?

6        A     No.

7        Q     Do you recall any kind of arrest

8 relating to someone taking pictures of your property?

9        A     Definitely not.  Now, you remember you

10 used the word arrested.  I wasn't arrested.

11        Q     What happened?

12        A     I was taking pictures of those white

13 niggers that had all the pit bull dogs.

14        Q     What does that mean, that derogatory

15 term, what does that mean?

16        A     They're like a Negro except they're

17 white.

18        Q     What do you mean by that?

19        A     White niggers.

20        Q     What does mean?  I'm sorry, I don't

21 understand.

22        A     Whatever it means.  I'm not even going

23 to lower myself to that level.

24        Q     Wait a second.

1        A     I was trying to take pictures of these

2   vicious dangerous dogs that the dog warden wasn't

3   doing anything about, nor would the commissioners do

4   anything about it.

5        Q     When was that?

6        A     I don't remember that exact date.  This

7   was at Pamela Daughterty's, I remember that.

8        Q     Was it in the nineties?

9        A     No, it seems to me -- it might have

10  been in the nineties.  I can't remember.  But she came

11  around and grabbed that camera from me and assaulted

12  me.  Now, by the way, this is the same little girl

13  that assaulted her brother and then the judge says,

14  gosh, I don't believe you.

15        Q     Who did he say that to?

16        A     The judge said that to me.

17        Q     You used a term that I want to make

18  clear on the record what it means because I've never

19  heard it.

20        A     You've never of white nigger before?

21        Q     I've never heard that term before.

22        A     I'll be darn.

23        Q     What does that mean?

24        A     I don't know exactly.  It has reference

1    to a derogatory manner.

2            Q       Okay.  How is that derogatory?

3            A       Toward Pam Daughterty?

4            Q       Yes.  What are you trying to say when

5    you use that term?

6            A       I was trying to get pictures of those

7    damn vicious dogs that were staked out back of that

8    house that the commissioners nor the dog warden would

9    do anything about.

10           Q       What do you mean when you use that

11   descriptive term about Pam Daughterty?

12           A       Just off-the-cuff thing.

13           Q       What does it mean?

14           A       I don't remember what it means.

15           Q       Is it a derogatory term?  Is it a term

16   you use often?

17           A       No.  See, you got to remember now I

18   served 22-and-a-half years in the military with lot of

19   fine black men and a lot of fine white men and a lot

20   of white niggers and a lot of black niggers --

21           Q       Okay.

22           A       -- in the most derogatory sense that

23   you can think of.  Whatever that may be.  Use your own

24   judgment.

121

1          Q      You're the one saying it, so I don't

know what it means.

2

3          A      I don't remember either.

4          Q      Okay.  Were you arrested or charged

with anything as a result of that altercation?

5

6          A      I was not arrested.

7          Q      Were you charged with anything?

8          A      No, I was not charged with anything.

9          Q      Have you ever been convicted of a

misdemeanor?

10

11         A      Yes.

12         Q      What?

13         A      Deputy -- the one, the other lawsuit.

14         Q      The March of 1998 incident?

15         A      Yes, 3-11-98, buddy Moore, that's

correct.

16

17         Q      You were convicted of assaulting a

police officer?

18

19         A      No.

20         Q      What were you convicted of?

21         A      Misdemeanor, just a plain misdemeanor.

Not of a police officer or anything like that.

22

23         Q      Were you convicted of assault?

24         A      Assault and menacing.  That's what it

122

1    was.

2        Q    And who was the assault against?

3        A    Allegedly it was against Buddy Moore.

4        Q    What was Buddy Moore?

5        A    A deputy sheriff.

6        Q    You were convicted of that in 1998?

7        A    That's right.

8        Q    What other convictions do you have?

9        A    None.  None that I can recall.

10        Q    You would recall them, wouldn't you, if

11    you were convicted?

12        A    I would hope so.  I am getting very

13    weary of this whole line of questioning and so forth.

14        Q    Have you ever been convicted of a

15    felony?

16        A    No.

17        Q    Other than this civil lawsuit that you

18    filed in this case and the one -- the other case that

19    you have, have you ever filed any other lawsuits?

20        A    No.  Wait a minute.  I did too.  I just

21    filed a small claims, just filed a small claims.

22        Q    You just filed a small claims case?

23        A    Yes.

24        Q    When?

123

1        A       It was in 2006 here.  I don't recall

2    the exact date.  The court ruled against me, so that's

3    gone.

4        Q       Who did you file it against?

5        A       A fellow that was supposed to do a

6    quotation on my driveway for the gas truck that

7    damaged my driveway by the reckless operation of the

8    driver.

9        Q       What did they do to your driveway?

10       A       Broke the edges off.

11       Q       When they were filling your tank?

12       A       Yeah, driving in to fill the tank,

13   that's correct.

14       Q       Any other lawsuits you've ever filed or

15   had filed on your behalf?

16       A       None that I can think of.

17       Q       Have you ever tried to sell your house?

18       A       No.  Couldn't get out of it what I got

19   in it.

20       Q       You don't think you could?

21       A       Please?

22       Q       You don't think you could get out of it

23   what you got in it?

24       A       I don't think so.

1        Q    Do you recall a conviction in Brown

2  County where you were convicted for disorderly conduct

3  and served 30 days in jail?

4        A    Where I served what?

5        Q    Thirty days in jail for disorderly

6  conduct.

7        A    By whom?

8        Q    I am asking do you recall that?

9        A    I don't recall that, no.  As I say, I

10  did serve a 30-day jail sentence with that Buddy

11  Moore.

12        Q    Is that the only time you have been in

13  jail for any length of time?

14        A    Uh-huh, that's correct.

15        Q    What ended up happening with the

16  charges that were filed against you on October 11,

17  2000, what happened?

18        A    What do you mean what happened?

19        Q    Did you go to court?

20        A    Yes.

21        Q    And what happened?

22        A    She, Judge Clark, dismissed it, but it

23  was under Criminal Rule 29 and that's not the way she

24  wrote the dismissal.  She just dismissed the case and

1    she can't do that because I was acquitted.

2            Q    They found you not guilty?

3            A    That's right.

4            Q    Who did?

5            A    Judge Clark.

6            Q    Did you go through a trial?

7            A    Yes.

8            Q    When did the trial begin?

9            A    2001.

10           Q    How long did the trial last?

11           A    Just one day.  That would be Case No.

12   CRB-001246.

13           Q    But do you understand there is a

14   difference between being acquitted and between charges

15   being dismissed?

16           A    Not when -- not when Criminal Rule 29

17   tells me it is an acquittal.  That would be the word

18   that I would be expecting because that's the way it's

19   written, but she just dropped the charges.

20                    - - -

21           Discussion held off the record.

22                    - - -

23   By Mr. Vincent:

24           Q    Sir, have you ever been accused of

126

1    shooting anyone else's dog?

2         A    Oh, yes, definitely.

3         Q    Have you ever shot anyone's dog?

4         A    No, never.  Let me back off on that.

5    One time about 30 years ago a fellow's dog was hit

6    crossing the road and he asked me if I would please

7    shoot it for him, which I did.  As far as in Brown

8    County, I've never shot a dog.

9         Q    You've been accused of it several

10   times?

11        A    I have been accused of it many times.

12        Q    You seem to have a problem with a lot

13   of your neighbors.

14        A    You don't suppose it might be the

15   neighbors, do you?

16        Q    It may be.  But I'm wondering -- just

17   so I can understand why you have so many problems with

18   your neighbors, can you tell me do you know why?

19        A    No, idea.  I have no idea.  I have

20   never done anything wrong to those people, and I sure

21   as hell never shot any of their dogs.

22        Q    Can you explain why -- you've mentioned

23   you called numerous times on people littering and

24   breaking bottles in your yard.  I mean, do you know

127

1    why they would do that to you?

2          A    I have no idea.  I never bothered

3    anyone.  Mom and I moved up there, we're quiet people.

4    We maintain our place in excellent order.  We even

5    have those bastards come down and steal our vegetables

6    out of the garden.  Now, that's what some -- that's

7    what they have moved in on us.

8          Q    You can't understand why they do these

9    things to you; right?

10          A    I have no idea why they're doing it.

11          Q    Besides barking dogs and littering, do

12    you recall making other reports to the sheriff's

13    department for things such as noise, radios?

14          A    Well, here again, now, the kids on

15    their motorcycles and four wheelers are forever

16    harassing.  As a matter of fact, I called just the

17    other day for the sheriff's department to put a stop

18    to it right across the creek from us because I was out

19    trying to rake some leaves up and here these kids are

20    back and forth, back and forth with these noisy bikes.

21          Q    Are they on your property?

22          A    No.  I said across the creek from us.

23          Q    I didn't know if you owned the creek as

24    well.

128

1        A      Do not.  Do not.  The road is closed.

2    So, therefore, it's not supposed to be used for

3    anything.  They make it a recreational thing for them.

4    The hell with the noise they're making that bothers

5    me.

6        Q      What other kind of complaints?

7        A      That's all I can think of right offhand

8    unless you refresh my memory on something again.

9        Q      Sir, have you had an opportunity today

10    to tell me all of the ways in which Deputy Snyder,

11    Deputy Meyer, Deputy Hudepohl, and Deputy Gray

12    violated your constitutional rights?

13        A      If you are going to let me repeat the

14    amendments that I know of.

15        Q      I'm sorry, your first and fourth

16    amendment rights?

17        A      Then I have nothing further to say.

18        Q      Okay.  You've had an opportunity to

19    tell me all of the ways they did; correct?

20        A      That's all I can recall of.

21        Q      All right.

22        A      Just offhand.

23        Q      I think we've already made this very

24    clear but I want to make it clear again.  So that I

129

1    don't have to ask you for all of the ways you are

2    claiming monetary damages, I believe that you've told

3    me today under oath that I can rely on the details of

4    your damages that you gave to Judge Weber during the

5    November 3, 2005 hearing; correct?

6           A    Best I can recall, yes.

7           Q    That way I can avoid asking you a lot

8    of additional questions.  I can look at that

9    transcript.  Fair?

10          A    Fair.

11          Q    Sir, since October 11 of 2000 have you

12   been arrested?

13          A    I didn't hear everything.

14          Q    Have you been arrested since October 11

15   of 2000?

16          A    No.

17          Q    For any reason?

18          A    No.  Where did you get that?

19          Q    I don't know.  I think you gave it to

20   me.

21          A    Can I see it?

22          Q    No.

23          A    Let the record show I did not get a

24   probable cause affidavit that was typed.

1       Q     Sir?

2       A     I got a chicken scratch.

3             - - -

4      Discussion held off the record.

5             - - -

6  By Mr. Vincent:

7       Q     Sir, is there anything else you want to

8  tell me about October 11, 2000 you haven't had an

9  opportunity to already tell me?

10       A     Nothing that I can think of at this

11  time.

12       Q     All right.  Are there any other claims

13  relating to October 11, 2000 that we haven't already

14  talked about that you believe exist?

15       A     I believe you've covered it completely.

16       Q     All right.  If you should remember

17  something else, obviously you are going to have to let

18  me know and I will redepose you on what you recall.

19           What documentation do you have

20  surrounding those events of October 11, 2000, what

21  documents?

22       A     Everything that you have.

23       Q     Do you have any documents you have not

24  given to me?

131

1          A    I have this right here which would be

2    my discovery.

3          Q    Are they discovery requests?

4          A    Yes, discovery of Snyder and Meyer.

5          Q    We can talk about that off the record.

6    I think we're wrapped up for your deposition here

7    then.

8          A    Very good.

9                         - - -

10              (Signature not waived.)

11                        - - -

12              Thereupon, at 2:12 p.m., on Monday,

13   February 6, 2006, the deposition was concluded.

14                        - - -

15

16

17

18

19

20

21

22

23

24

133

CERTIFICATE

STATE OF OHIO          )
                       )    SS:
COUNTY OF MADISON      )

        I, Denise L. Shoemaker, a Notary Public
in and for the State of Ohio, duly commissioned and
qualified, do hereby certify that the within named
William D. Reynolds was by me first duly sworn to
testify to the truth, the whole truth, and nothing but
the truth in the cause aforesaid; that the deposition
then given by him was by me reduced to stenotype in
the presence of said witness, afterward transcribed
upon a computer; that the foregoing is a true and
correct transcript of the deposition so given by him;
that the deposition was taken at the time and place in
the caption specified and was completed without
adjournment; and that I am in no way related to or
employed by any attorney or party hereto, or
financially interested in the action.

        IN WITNESS WHEREOF, I have hereunto set
my hand and affixed my seal of office at London, Ohio,
on 18th day of February 2006.

                    _Denise L. Shoemaker_
                    Denise L. Shoemaker,
                    Notary Public-State of Ohio

My Commission Expires:  January 26, 2009.